ANNA WARE, AN INFANT, BY MARY WARE, HER NEXT FRIEND, PETI-
TIONER, v. LUDWIG O. MUENCH AND NELLIE TIPTON MUENCH, HIS
WIFE, WILFRED JONES, HELEN BERROYER, REBECCA WINNER, AND
CARL M. DUBINSKY, RESPONDENTS.—89 S. W. (2d) 707.

St. Louis Court of Appeals. Opinion filed December 13, 1935.

Motions for rehearing overruled December 19, 1935.

Motion to modify decree overruled December 19, 1935.

*Thomas Bond, William L. Berthold* and *Harry C. Barker* for peti-
tioner.

*Paul Dillon* and *Edgar J. Keating* for respondents Ludwig O. and
Nellie Tipton Muench.

*Shepard R. Evans* for respondent Wilfred Jones.

*Harry N. Soffer* for respondent Helen Berroyer.

*Anderson, Gilbert & Wolfort* for respondent Rebecca Winner.

*Jerome F. Duggan* for respondent Carl M. Dubinsky.

*Rush H. Limbaugh,* Special Commissioner.

LIMBAUGH, S. C.—This is a *habeas corpus* proceeding involving the identity and custody of a child some three months of age.

The case originated in this Court upon the petition of Anna Ware, a minor of the age of nineteen years, acting through her sister and duly-appointed next friend, Mary Ware. By her petition Anna Ware charged the respondents with wrongfully and unlawfully taking away from her a male child born to her in the City of St. Louis, Missouri, on August 17, 1935, and keeping, imprisoning and withholding the child in the home of respondents Dr. Ludwig O. Muench and Nellie Tipton Muench, who falsely claim it as their own, and depriving it of its liberty, and its mother, the petitioner, of its care and custody. The petition contained a prayer that a writ of *habeas corpus* be issued against respondents, and that the child be discharged from its unlawful imprisonment and restored to the possession and custody of the petitioner. The petition was verified as required by statute.

Responsive to the prayer of the petition, this Court issued and caused to be served on each of the respondents a writ of *habeas corpus.* On the return day of the writ, respondents Muench filed a verified joint return denying generally that they had possession or custody of or anything to do with or any knowledge of the taking, keeping, imprisoning, withholding or restraining of petitioner's baby, or that they were depriving petitioner of its possession, custody or control, and denying that petitioner's child was being wrongfully and unlawfully kept and restrained of its liberty in their home. Respondents Muench by their joint return did not aver or claim that the child later shown to be in their home was their child. Each of the other respondents filed a separate verified return of the same general purport.

To these returns petitioner filed separate replies in the nature of traverses, denying generally and specifically the averments in the returns. In the reply to the return of respondents Muench, petitioner alleged that about one hour after her child was taken from her on the night of August 17, 1935, it appeared in the home of respondents Muench, who, on the following day, made a false public announcement that a male child had been born to Nellie Tipton Muench at 12:30 A. M. on August 18, 1935, but that Nellie Tipton Muench did not give birth to such child or any child, and that her claim that she was the mother of the child in her home was false. By her said reply petitioner further charged that the child in the home of respondents Muench was unlawfully procured and taken away from petitioner on

the date of its birth by respondent Wilfred Jones and other unknown persons in the perpetration of an unlawful conspiracy on the part of the respondents, the main purpose of which was to procure for respondents Muench a baby which they could palm off on the public as their own. Petitioner filed replies to each of the returns of the other respondents, denying generally and specifically the allegations contained in said returns.

When the issues were thus joined, this Court appointed the undersigned as Special Commissioner to hear the testimony and report his findings of fact and conclusions of law and recommendations to the Court. After the Special Commissioner qualified, hearings were held before him, continuing through a period of nearly four weeks, at which hearings the petitioner produced fifty-six witnesses and the respondents thirty, and each side, in addition, produced various kinds of exhibits, including letters, photographs, court files and other documents.

During the course of these hearings, the Special Commissioner exercised a policy of great latitude in the admission of evidence, owing to the character of the issues and to the fact that the welfare and destiny of a child of tender age are involved and its identity and parentage questioned. Respondents made objections to parts of the evidence offered by the petitioner, some of which evidence was taken with the case subject to the objections, with the understanding that such objections were to be ruled with the case, and such evidence, if found inadmissible, disregarded; and now, as a part of his report, the Special Commissioner sustains all of said objections.

Before finishing with the production of her evidence, petitioner voluntarily dismissed the proceedings as to respondents Rebecca Winner and Carl M. Dubinsky, leaving Ludwig O. Muench, Nellie Tipton Muench, Wilfred Jones and Helen Berroyer as the sole remaining respondents in the cause.

During the course of the hearings, the Special Commissioner entered an order requiring respondents Ludwig O. Muench and Nellie Tipton Muench to produce in court the child theretofore shown to be in their home, so that said child, whose identity was in issue, could be viewed, examined and identified, and be held, under order of the Court or Special Commissioner, subject to view, examination and identification by the Court and Special Commissioner and the parties to the cause and their counsel and witnesses. A writ of prohibition to restrain the Special Commissioner and the Judges of this Court from enforcing such order was applied for by respondents Muench in the Supreme Court of Missouri, and pending action on such application in the Supreme Court said order was held in abeyance. The Supreme Court of Missouri denied the writ of prohibition, following which respondents Muench produced in court the child in their home, whereupon this Court ordered that the child remain in the custody

of the Court and be kept in the St. Louis Children's Hospital, in St. Louis, Missouri, under all due and proper care. That order remains in effect, and the child is now in the St. Louis Children's Hospital, pending final determination of this cause.

While the ultimate issue in this case is like that ordinarily involved in a *habeas corpus* proceeding in the sense that it is to determine who has the right to the custody of a child, the determination of that issue here involves a problem of much greater import and one charged with far graver responsibilities than is usually presented for decision. The final issue upon which the case turns is, of course, should the baby now held by this Court be placed in the custody of petitioner, Anna Ware? But the immediate question preceding the determination, and indeed decisive, of such main issue is the identity of the child. Is this baby the child of petitioner? If it is, it follows, as day follows night, that the child should be placed in petitioner's custody. If it is not, then the purpose of this proceeding fails, and the prayer of the petitioner that the child be placed in her custody through the use of the writ herein issued should be denied.

For the determination of the issue of identity, there is scarcely a precedent. Even the Scriptural story related as evidence of the wisdom of a renowned ancient king (1 Kings 3:16-28) does not present an exact parallel or furnish practical aid here for the solution of the problem of identity. The evidence offered by the parties to the cause and the inferences to be legitimately drawn therefrom must alone furnish the key for the determination of that problem.

The evidence shows, as we shall presently point out, that the child now in the custody of the Court, and about which this case revolves, is the same child that first appeared in the home of respondents Muench in the City of St. Louis, Missouri, either on the evening of August 17 or the early morning of August 18, 1935. It is the same child that had been in the home of said respondents almost continuously from that time until it was produced in this Court upon the order of the Special Commissioner on October 30, 1935.

Did Mrs. Muench give birth to the child as respondents' evidence, in a general way, purported to disclose? Petitioner charges that she did not, and the evidence abundantly supports that charge. Mrs. Muench is forty-four years of age. She had been married twenty-three years before her purported birth of this child, and had never before borne a child. Childbirth for any childless woman of her age would have been attended with great difficulties and personal dangers. For such a critical event in the life of any woman, and particularly that of the wife of a physician, living on a plane like these respondents in a large city, hospitalization, expert medical attention and skilled nursing are all considered indispensable to the life and well-being of both the mother and the child.

Approach to the event of expected childbirth for persons like re-

spondents Muench could not have been easily made in secrecy, or without a revelation of the evidences of what was about to occur. It is difficult to conceive how the event of childbirth to Mrs. Muench could have occurred under circumstances which raised such a question of doubt as to whether the event did occur, and in the light of ordinary human experiences it is equally inconceivable why the event should have been kept secret at all.

A few incidents were shown to have occurred prior to the supposed event of childbirth which cast an immediate doubt upon the possibility that Mrs. Muench bore a child. A maid who proved to be uncongenial to Mrs. Muench after a short stay in the Muench home in May, 1935, testified that Mrs. Muench menstruated during that period and less than three months prior to the alleged childbirth. This housemaid also said that one day during the brief period she was in the Muench home Mrs. Muench told her, as she was leaving home, that she was going to attend a cocktail party where she expected to meet a physician friend of hers (as to whose connection with the case there will be further mention) and that she was going to make him believe that she was pregnant. Upon the return of Mrs. Muench from the party, she told the maid that she had met her physician friend and had succeeded in making him believe that she was an expectant mother. Some of her closest neighbors observed her at different times immediately prior to the alleged birth of her child, some of whom saw her clad in a bathing suit basking in the sun about her home, and had noticed no change in her outward physical appearance indicating expectant motherhood. On July 11, 1935, Dr. Aaron Levy observed Mrs. Muench in her home, when he was called there to visit the child known as the Price Baby, which will be hereinafter more fully referred to, and he saw no signs at that late day that indicated that Mrs. Muench was so soon to become a mother.

From the evidence, it appears that the alleged birth of a child to respondents Muench is supposed to have occurred under the strangest and most mysterious circumstances. It was at about the hour of midnight. The family butler and chauffeur had departed for the night. The colored maid was away at a picture show. Mrs. Muench had been left at the home alone, although the colored maid said that she had complained of pains and hurting as early as noon of that day. Helen Berroyer, a respondent herein and a close personal friend and associate of Mrs. Muench, had been called by telephone by Mrs. Muench at about 9:00 or 9:30 o'clock that evening. She had been asked by Mrs. Muench to come alone and see her, because she was feeling ill. Mrs. Berroyer testified that she went immediately to the home of Mrs. Muench and found that she was having pains intermittently, the severity of which increased during the evening. No other person was then in the Muench home. Dr. Muench was located by telephone and came home. By this time Mrs. Muench had taken her bed. No nurse

was called. According to the testimony of Mrs. Berroyer, the only person who purported to tell of the event of childbirth, she left the supposed confinement chamber when Mrs. Muench appeared in much distress and personal suffering, and went to the icebox in the kitchen for a drink of whiskey. While there, she saw a man go upstairs toward the bedroom of Mrs. Muench. She did not know him. He was not introduced to her at all. Later, when she inquired who this man was, Dr. Muench is supposed to have told her he did not want to divulge that information. After this unknown man arrived, Mrs. Berroyer did not again go back into Mrs. Muench's bedroom, although she was the only woman in the house and Mrs. Muench had called her to come over and be with her. Instead, Mrs. Berroyer stayed in the hallway outside the bedroom of Mrs. Muench, where Dr. Muench passed her three or four times going between the bedroom of Mrs. Muench and the bathroom. Finally, on one of these trips, Dr. Muench was said to have stated to her that they had a baby boy. No one was present except Mrs. Muench, Dr. Muench and the other man, whom Mrs. Berroyer did not know, who did not appear to testify, whose identity has not been established, and whose connection with the event remains a mystery. No special equipment such as hospitals provide to assist in the period of labor during confinement had been provided for the bedroom of Mrs. Muench. No nurse was called or appeared to help. If anything was said that night about taking Mrs. Muench to the hospital, it was not divulged. But that it was a case where hospitalization could have been provided, because there was ample time for it, appears certain. So far as appeared at the hearing, no arrangements for hospitalization had either been contemplated or made.

Other strange incidents related tend to deepen the mystery in which the story of the birth of a child to respondents Muench has been cast. Dr. Muench is not an obstetrician. He has been a medical attendant at childbirth only on rare occasions in the last several years. If the other man who attended the supposed birth of a child to Mrs. Muench was a physician, no one in this hearing deigned to say so. The report of the supposed birth of the child was certified to the City Health Commissioner by Dr. Muench. This certificate recited that Dr. Muench himself attended his wife at childbirth, an incident termed by the City Health Commissioner as extraordinary. The statement of facts in the birth certificate having been questioned by the Health Commissioner, two physicians, at the request of Dr. and Mrs. Muench, signed written statements tending to support the certificate of Dr. Muench that Mrs. Muench had given birth to a child. Both of these physicians testified in these hearings. One of them, Dr. Marsh Pitzman, who it was that Mrs. Muench had theretofore deceived as to her pregnancy, said that his written statement had not been based upon information received by him as a physician, and that he had never made a physical examination of Mrs. Muench, but that his written

statement was based purely on what she had told him and his observations of her outward appearance. He repudiated the written statement he had previously made that, in his opinion, Mrs. Muench had given birth to a child, and said that in his opinion she did not give birth to a child. The other physician, Dr. Maurice Thompson, said that his statement in writing indicating that Mrs. Muench had given birth to a child was made on the faith of the history of the case as related to him by Dr. and Mrs. Muench, and was given by him as a friend of Dr. Muench.

In drawing aside the veil of mystery surrounding the strange circumstances upon which the defense is based, we are not assisted by any testimony of Dr. Muench or Mrs. Muench, for each of them declined to answer any of a series of questions propounded to them, including the question of whether a child had been born to them, on the ground that their answers might tend to incriminate them. Nor, as we have already pointed out, did these respondents make any specific claim that this child was their child in the return they filed under oath herein, contenting themselves rather with a mere denial of their possession or knowledge of the whereabouts of petitioner's child.

A further incident is likewise characteristic and significant. Different witnesses testified that they had been shown by Mrs. Muench an X-ray photograph of the pelvic region of an expectant mother, showing a foetus, and that this photograph bore the name, written thereon in ink, "Mrs. Ludwig O. Muench." Mrs. Muench showed this X-ray photograph to Dr. Pitzman a few days before the purported birth of a child to her, and after he looked at it, supposing that it was a picture taken of her, he decided that she was pregnant. Similar X-ray photographs had been made of Anna Ware by Dr. Simon Levey a short time prior to her confinement. These photographs were delivered to Dr. Denny, who attended Anna Ware at childbirth and who had requested that they be made, and Dr. Denny gave one of them to Wilfred Jones. The whereabouts of the latter photograph is unknown. Respondent Jones did not explain what he had done with it, and, strange to say, the supposed X-ray photograph of Mrs. Muench likewise disappeared. The Negro maid and the Negro nurse in the Muench home both stated that it was taken away from the Muench home by Dr. Pitzman, who positively denied, however, that he had taken it. Dr. Pitzman's motive for taking this photograph away with him, if he did so, was not even suggested. Had the latter photograph been found, it would have definitely revealed whether or not Mrs. Muench was pregnant at the time it is supposed to have been taken. For the purpose of determining whether it was a photograph of her, Mrs. Muench agreed during the hearing to have another like photograph made of herself. But this offer availed nothing, since she did not produce the original X-ray photograph, and the explanations offered of its disappearance are wholly incredible. Had such an X-ray

photograph ever been made of Mrs. Muench, that fact could either have been established by the person making the photograph, or the reason for not being able to establish the fact in that way easily explained. No such person was produced to testify, nor was his name or the occasion of the making of the photograph suggested.

The attempts on the part of the respondents Muench to conceal the event of the birth of a child to them in secrecy, surrounded by circumstances which are the most mysterious, do not comport with human experiences or lend support to their contentions. Instead, their actions, when viewed in the light of the other testimony heard, lead to the conclusion that their claim that a child was born to Mrs. Muench on August 18, 1935, is utterly false, and that their efforts to support that claim represent deliberate and consummate deception. Mrs. Muench did not give birth to a child on August 18, 1935. The child in the custody of this Court is not the child of Nellie Tipton Muench or Dr. Ludwig O. Muench.

Is this the child of Anna Ware? The evidence on that point reveals a combination of circumstances which, when taken together, lead to a positive conclusion. In December, 1934, Anna Ware, an unmarried woman eighteen years of age, found that she was going to become a mother as a result of intimate relations she claims to have had with Francis Giordon, a married man, in whose home she had been serving as a housemaid for about two years, in the City of Newton, a suburb of Philadelphia. She lived alone with her secret until the following February, when she revealed her plight to Mrs. Giordon, the woman for whom she was working, and the wife of the man who was the father of her expected child. Anna Ware's father had died when she was a little child, and her mother had remarried. Anna and her older sister, Mary Ware, had spent some of their time during childhood in orphanages. Anna received only a fifth grade education, and at the age of fifteen she undertook the task of supporting herself by her own efforts. She worked at a number of places until she was employed by the Giordons at the age of seventeen, and her misfortune occurred before she became nineteen. It was May, 1935, before she revealed the secret of expectant motherhood to her sister Mary, who also worked in Newton.

While the two sisters were collaborating at the task of helping Anna out of the difficulties in which she had become involved because of her intimate relations with Mr. Giordon, a plan was suggested by Mrs. Giordon, with whom Anna had meanwhile talked confidentially of her situation. Mrs. Giordon's mother, Rebecca Winner, one of the original respondents herein, lived in St. Louis. In former years Mrs. Winner had served extensively as a midwife, and Mrs. Giordon told Anna Ware that she had arranged through her mother for Anna to go to St. Louis, where, after her child was born, the child would be adopted, and Anna would then have the opportunity to begin life all

over again. Anna's mother and sister not being in a position to help her, and Anna herself being without means to finance the expenses of childbirth and also welcoming the opportunity to avoid the notoriety of childbirth in her home community while she was yet unmarried, readily acquiesced in the suggestion of Mrs. Giordon. According to the plan worked out between Mrs. Giordon and her mother, Mrs. Winner, Anna received transportation to St. Louis, and was given assurance that she would be properly cared for by Mrs. Winner during childbirth, and that through the assistance of a St. Louis attorney, who represented a relative of Mrs. Winner who desired to adopt a child, Anna's child would be taken by a good family, and her own immediate needs cared for.

· The plan obviously relieved the Giordons of a most awkward situation and took the expectant mother far away from all the people she had ever known. On her arrival in St. Louis, Anna Ware was taken by respondent Wilfred Jones, the attorney in question, to the home of Mrs. Winner. There she awaited the approaching event of motherhood. Occasionally, Jones took her out riding in an automobile, and on one of these occasions Anna Ware became frightened when Jones asked her to describe the father of her unborn child. She became suspicious of Jones' purposes, and feared that he would take her child away where she could not see it. She wanted to avoid him and flee, but she had gone too far in the course agreed upon, and had no means of helping herself. Her suspicions and fears increased when Jones called for her to go driving with him a few nights later. It was about 9:30 at night when he arrived. Anna suggested that it was rather late to go out for a drive, but Jones replied that he had been so busy all day he had not been able to come earlier. Mrs. Winner suggested that Anna go with him on the drive. When Anna arrived at the car, she found that there was a woman in the front seat with Jones. Jones introduced the woman to Anna as "Mrs. Perkins." Little was said as they drove together until the woman asked Anna about the color of her eyes, and whether or not her hair was naturally curly. In the course of the ride they drove into Forest Park, where they stopped under a light and got out of the car. Here Anna had her first chance to observe the features of the women who had been seated in the car beside Jones. Anna was afraid and highly suspicious. She looked carefully at the woman, and made mental note of the details of her appearance. On their return, Anna told Mrs. Winner she had seen the women who she believed was to take her baby. Mrs. Winner agreed that this might have been the woman. During the hearing, Anna positively identified respondent Nellie Tipton Muench as the woman who was with her and Jones on the night of this ride together when they stopped in Forest Park.

After this incident, Anna was more uncertain than ever as to the outcome of the plan for the adoption of her child. She expressed her

uneasiness to Jones, but he gave her constant assurance that everything would be all right.

The baby was born to Anna Ware in the early morning of August 17, 1935, in the home of Rebecca Winner, in the City of St. Louis, Missouri. Dr. Denny and Mrs. Winner cared for her at the time. The baby remained in bed with Anna during the day and until about 11:00 o'clock that night. At that time, Wilfred Jones and a woman dressed in a nurse's uniform came to the home of Mrs. Winner. Anna had been asleep but was awakened by the nurse's voice and was told that she had come to take her baby. Anna then asked Jones if she was going to take away the baby at that time of night, and he told her they were going to take it to the Jewish Hospital, where Anna could see it when she desired. She was asked to kiss the baby good-bye, but she told the nurse and Mrs. Winner that while she would kiss the baby, she would not kiss it good-bye, because Mr. Jones had told her he was going to place it in a hospital where she would have a chance to see it. The woman in the nurse's uniform silently picked up the baby from Anna Ware's bed, and quietly walked out of the room and out of the house, followed by Wilfred Jones.

It was in something like an hour thereafter that a baby appeared in the home of respondents Ludwig O. Muench and Nellie Tipton Muench. At that time, respondents Muench were anxious to procure a baby, and thereafter Dr. Muench certified that a child had been born to Mrs. Muench, at 12:35 A. M., August 18th, as heretofore related. Mrs. Muench was then under indictment for participating in the kidnapping of Dr. I. D. Kelley, a wealthy St. Louis physician, and her trial on that charge was to be held in Mexico, Missouri, just one month later. Her purpose to secure and pretend that she had given birth to the baby was presumably conceived, in part at least, for the purpose of enabling her to gain sympathy from the jury trying her in the kidnapping case pending, although the evidence fairly warrants the belief that she may have had even more ulterior motives in mind.

This purpose on the part of respondents Muench had been divulged by another strange circumstance that had occurred in the preceding July. On July 11th Dr. Aaron Levy, head pediatrician at the Jewish Hospital, was called by Dr. Muench to the latter's residence in St. Louis to attend a baby. Dr. Levy arrived at the Muench residence in the afternoon and immediately sensed a mysterious situation. He was shown a baby, and was told by Dr. Muench that they wanted the whole matter kept secret. The situation was such that Dr. Levy felt called on to explain that he knew how to be tactful but that he would not be a party to deception. No explanation was made to him as to the strange appearance in the Muench home of this child. It was a newborn baby. Upon his examination of it, Dr. Levy found it critically ill. He suggested immediately that it be moved to the Jewish Hospital. Later that evening Wilfred Jones and a woman took this

baby to the Jewish Hospital, where the woman signed certain entry papers, required by the hospital, as "Helen Myers." A hospital nurse who was present at the time these papers were signed by the woman who wrote her name as "Helen Myers," and a young doctor who was an interne in the hospital, both identified this woman as the respondent Helen Berroyer, who, incidentally, lives with her mother whose name is "Myers." A handwriting expert said that the handwriting of the name "Helen Berroyer" on the latter's return in this cause as well as on other papers used in the hearing and admittedly written by Helen Berroyer, was the same handwriting as that used by the woman who wrote the name "Helen Myers" at the Jewish Hospital when the baby was entered there from the Muench home on July 11. This child had been taken from its unwedded mother, Estelle Oberg, by Wilfred Jones, who also represented to her that he was taking it to some clients who wanted to adopt it. The child remained in the Jewish Hospital five days, at the end of which time it died. Arrangements for its burial were made after its death by Wilfred Jones, with whom the hospital authorities communicated, according to his directions. This baby, the child of Estelle Oberg, an unmarried woman, and one Arnold Price, was taken to the Muench home to be used by respondents Muench as their child. After the death of that child, it became necessary for them to secure another child to accomplish their purpose, and, through the manipulations of respondent Jones, Anna Ware's child was obtained. It was taken from the Winner home to the home of respondents Muench the night following its birth, and remained there until the hearing in this cause.

The child of Anna Ware was obtained as part of a conspiracy on the part of respondents Muench, assisted by Wilfred Jones and Helen Berroyer. The conduct on the part of these conspirators, as revealed by their actions and their testimony during the hearing, clearly evidenced the conspiracy. Respondent Jones was absent during the first week of the hearing, and strenuous efforts to discover his whereabouts and procure his presence in court proved unavailing. No excuse was assigned for his absence. Appearing at the hearing at the opening of the second week after his counsel had publicly stated his intention to withdraw from the case if he did not appear, he made no satisfactory explanation of his earlier absence. He began taking part in the hearing, and from the part he was taking it was at once apparent that his purpose was to conceal, rather than to aid, in the ascertainment of the facts before the Special Commissioner. Upon taking the witness stand himself, he assumed an attitude of evasion, equivocation and insolence that was obviously designed to throw the entire hearing into a state of confusion and uncertainty. According to his own admissions, he was the central figure in the episode connected with the placing of the Price baby in the Muench home and later taking it from there to the Jewish Hospital, where it died. He was likewise the central figure

in taking Anna Ware's baby away from her. He knew with whom Anna Ware's baby had been placed. He refused to divulge the name of these people, a purported husband and wife, who he said were his clients, on the ground that these clients had instructed him not to divulge their names. He claimed the right to refuse to state their names on the ground that this would be a violation of the right of privileged communication between attorney and client. He would not violate that privilege except by direction of the Special Commissioner.

The Special Commissioner ruled that the purported contract of employment between respondent Jones and his unnamed clients was not such employment as would furnish the basis for the relationship between attorney and client such as would enable him to claim the privilege, and directed that he state who the persons were with whom he had left Anna Ware's child. It was immediately revealed that respondent Jones had studiously prepared to meet the situation in the event the Special Commissioner directed him to divulge the names of his purported clients. He then stated that these purported clients were Mr. and Mrs. J. R. Palmer, who had formerly lived in St. Louis, and had later moved to Memphis and then to Chicago, where they were supposed to be living at the time of his testimony. He stated with precision his supposed relations with these clients, and said that he might be able to locate them and determine whether or not they still had Anna Ware's baby. His entire conduct as a party and as a witness betrayed a skilled effort to evade giving to the Court the information which he clearly had and which was needed to settle the issues pending. In the consummation of that purpose he was shown to be working hand in hand with respondents Muench, with whom he conferred during the progress of the hearings after he entered his appearance, and at whose home he admitted he had met these other respondents before he put in his attendance at the hearings.

After the testimony of respondent Jones was concluded, the Special Commissioner urged him to contact the parties having Anna Ware's baby and have them bring it into court, and appealed to him, as an attorney and officer of the Court, to assist the Court in arriving at the truth in connection with the hearings. No effort on his part to comply with that request appeared forthcoming, but instead certain of the other testimony that followed his tended on its face to corroborate a part of the story he had told.

Finally, petitioner placed on the stand Mrs. J. R. Plummer, who lived with her husband in Minneapolis, and who had formerly lived in Chicago, Memphis, and St. Louis. She and her husband had known respondent Jones in St. Louis. They had talked with him about the adoption of a child. Through him they had for a time kept the daughter of one Grace Thomasson Diefenbach, a friend and consort of respondent Jones, who had been named by him as the nurse

who accompanied him in taking both the Price baby to the Jewish Hospital and Anna Ware's baby away from her. Mrs. Plummer's testimony accorded in minute detail with the testimony of Wilfred Jones relative to the identity and movements of the persons who took the Anna Ware baby, and showed that she and her husband were, without doubt, the persons who had been named by respondent Jones in his testimony as "Mr. and Mrs. J. R. Palmer," who had taken the Ware baby. There was no question of doubt as to that fact.

The testimony of Mrs. Plummer was given before the Special Commissioner at a time when an assistant of the Circuit Attorney of the City of St. Louis was in attendance. It came as the culmination of a series of facts and circumstances that so conclusively stamped respondent Jones as a perjurer that the Special Commissioner, in open court, from the bench, called the circumstances of the testimony of respondent Jones to the attention of the Assistant Circuit Attorney and stated that respondent Jones was guilty of having committed flagrant perjury, and asked the assistant of the Circuit Attorney to proceed to act upon the state of facts thus revealed. As an attorney and officer of the Court, respondent Jones owed the Court a duty to state the truth relative to the matter under investigation. His prior conduct relative to those matters was not only grossly unbecoming a member of the bar and in patent violation of his public duty as a lawyer and officer of the Court, but his purported explanation of the circumstances was so evasive and wholly incredible as also to destroy all credibility that might have attached to the testimony of an honest witness.

Both in its minuter aspects as well as in its broader scope the evidence of the petitioner established the facts charged in her petition and in her reply to the return of respondents Muench, namely, that respondents Muench, Jones, and Berroyer had conspired together to procure a baby for respondents Muench so that they could palm it off on the public as their own. The processes of these conspirators were so insidious and their operations were so inimical and far-reaching that Anna Ware, a distant Pennsylvania girl, became entangled in the mesh of their spurious designs, and her child, even before its birth, became a helpless victim of the conspiracy. Under the cover of darkness, and when only a few hours old, it was taken from its mother's arms to the home of respondents Muench where it was thenceforth restrained of its liberty and deprived of its mother's care and custody. The evidence offered by respondents generally tended strongly to support, rather than to disprove, the charge of conspiracy, and that which was offered to support the claim that the child involved in this proceeding is the child of Mrs. Muench revealed that such claim was nothing more than a sham and shallow pretense.

And so particularly of the evidence which was offered as tending to show that the child that was supposed to have been born in the

Muench home was a premature baby. According to the alleged calculations of the pretending parents, the child was born six weeks before time for its natural birth. It was said that it weighed only some six and one-half pounds at birth, a weight pointed to by respondents as two pounds less than that of the baby born to Anna Ware at about the same time. A Negro nurse was engaged by respondents Muench to take care of the baby in their home immediately following the alleged birth, and this nurse described in detail how the baby in the Muench home was cared for from the beginning. The evidence showed that if premature babies are to live, it is indispensable that they have special care and feeding of the most particular nature adapted to their individual necessities. Moreover, highly skilled and widely experienced St. Louis physicians pointed out that if the baby that is claimed to have been born to Mrs. Muench was a premature baby, it could not possibly have survived under the schedule of feeding and care that the child in the Muench home was shown to have received. These same physicians also testified that under the usual processes of normal child development, it was impossible for a child weighing only six and one-half pounds at birth at the time this child was said to have been born to Mrs. Muench to have weighed twelve pounds, as this child did, at the time it was brought into Court in response to the order for its production. In fact the whole idea of the so-called Muench baby having been prematurely born was so thoroughly exploded during the progress of the hearing that even the respondents themselves seemed eventually to have abandoned it.

That the child now in the custody of the Court, and taken from the home of respondents Muench under order of the Special Commissioner made during this hearing, is the child of the petitioner, there can be no reasonable doubt. The child made its appearance in the Muench home immediately following the interval necessary to transfer it from the bed where it was taken from its mother until it was seen in the Muench home. It has made the usual normal development since that time. It was shown by the experts who examined it that it had characteristics strikingly similar to those of Anna Ware. The photographs of the child shown in comparison with the photographs of both Mrs. Muench and Anna Ware revealed a most pronounced likeness on the part of the child with Anna Ware in respect to the eyes, the nose, and the mouth, while showing no marked points of resemblance whatsoever between the child and Mrs. Muench. Particularly striking is the similarity of the mouth of the child with that of Anna Ware. Anna Ware positively identified the baby as her child. The indescribable but eloquent expression of motherly instinct and affection revealed by Anna Ware when she first saw the baby in court was significant. Had this not been Anna Ware's child, the respondents could have, and certainly would have, accounted for the present whereabouts of the Ware child. The child is the son of Anna Ware.

The finding from the evidence that the child now in the custody of the Court is the child of petitioner permits but one and only one conclusion on the part of the Court, which is that the child should be given over into petitioner's custody as its natural and proper guardian. This for the reason that the nature of this proceeding considered, and with all due regard to the limited issues involved, there is and could be no question raised respecting petitioner's right to have the custody of her child from these respondents, once her status as its natural mother is established. [Rochford v. Bailey, 322 Mo. 1155, 17 S. W. (2d) 941.] Quite obviously the unfortunate illegitimacy of the child could not serve to render this proceeding as instituted by petitioner any the less proper (29 C. J. 111), nor is petitioner's right to maintain the proceeding to be in anywise affected because she sues alone and without the joinder or intervention of the child's father, if his identity were otherwise duly and properly established. [Rochford v. Bailey, supra.]

The order and judgment of the Court should therefore be that the child be delivered into the custody of petitioner as prayed in her petition; and the Special Commissioner so recommends.

PER CURIAM:—The foregoing report, finding of facts and conclusions of law of Special Commissioner RUSH H. LIMBAUGH are adopted as the opinion of this court.

The order and judgment of the court is, therefore, that the child now in the custody of this court in this cause be delivered into the custody of petitioner as prayed in her petition. *Becker, P. J.,* in the case, and *Hostetter* and *McCullen, JJ.,* concur.