BROWN v. DEWITT.

1. HABEAS CORPUS—CUSTODY OF CHILD—ADOPTION—WELFARE OF CHILD.

Custody of child, as to whom adoption proceedings by defendants had been commenced but not completed, was properly denied child's natural mother and her husband, on their petition for habeas corpus where evidence sustains finding of trial judge that the welfare of the child required such denial.

2. ADOPTION—CONSENT—FRAUD—DURESS—MISTAKE—EVIDENCE.

In suit involving the custody of child which was obtained by defendants while it was a young baby, evidence *held*, to show that both the child's mother and her husband, plaintiffs, knew they were signing consent to adoption and that their signatures were not obtained by fraud, duress or mistake.

3. Parent and Child—Agreement as to Custody of Child—Enforcement.

While a parent's agreement surrendering custody of such person's child to another might have much weight as showing the unfitness of the parent and estopping him from seeking to repudiate a fair and beneficial agreement, it will not be enforced as a binding agreement unless it is for the benefit of the child.

4. Same—Custody of Child—Third Parties.

The rule that custody of a child will be left with the natural parent is not an absolute one since, if circumstances are such that it would not be for the good and welfare of a child to take it away from third parties and give it to the natural parent, the custody with the third parties will not be disturbed.

5. Same—States—Best Interest of Children.

A parent has no absolute power of disposition of the parent's infant children, the authority being subordinate to the supreme power of the State to protect the best interests of the child.

6. Infants—Governmental Protection.

Every child born in the United States has, from the time it comes into existence, a birthright of citizenship which vests it with rights and privileges, entitling it to governmental protection.

7. Parent and Child—Custody—Best Interest of Child.

The superior right of the parents to the custody of a child should only be enforced when it accords with the best interest of the child.

Appeal from Ottawa; Miles (Fred T.), J. Submitted January 14, 1948. (Docket No. 77, Calendar No. 43,814.) Decided February 16, 1948.

Habeas corpus by William C. Brown and wife against Richard C. DeWitt and wife to obtain custody of minor child. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Louis H. Osterhous,* for plaintiffs.

*Jarrett N. Clark* and *Linsey, Shivel, Phelps & Vander Wal,* for defendants.

BUTZEL, J. Plaintiffs William C. Brown and Esther Brown, husband and wife, filed a petition in a habeas corpus proceeding to obtain the custody of a child born to Esther Brown at a hospital in San Francisco on November 28, 1944. It appears that plaintiff William C. Brown is not the father of the child, it having been conceived while he was overseas with the armed forces. The child is in the custody of defendants Richard C. DeWitt and Julia Ann DeWitt, and is being brought up and cared for by them in their home in Zeeland, Michigan.

Five days after the birth of the child, Mrs. Brown, while still in the hospital, signed a written statement, witnessed by two hospital nurses, in which she waived all claims and rights to the baby and gave permission for its adoption. Two days later, after Mrs. Brown had left the hospital, both plaintiffs executed a more formal document in which they consented to the adoption of the child and also agreed:

"It is fully understood by us and each of us that we are giving up all our rights of custody, services and earnings of said child and that said child cannot be reclaimed by us or either of us. Our consent and the consent of each of us is given with the full knowledge that we and each of us is surrendering the care and custody of said child to said Richard DeWitt, also known as Dick DeWitt, and his wife Julia Ann Skipper DeWitt, also known as Judy DeWitt, husband and wife, and with the full knowledge that they intend to adopt the child and raise him as their own child and we and each of us by this consent hereby join in any petition that is filed with any court of competent jurisdiction for the adoption of said child."

Plaintiff's signatures on this document were witnessed by the doctor who delivered the child and it

was acknowledged before a notary public for the city and county of San Francisco.

No claim is made by defendants that the child has ever been legally adopted by them, although proceedings for such adoption were instituted in the probate court of Ottawa county soon after defendants were given the custody of the child. Defendants contend that the plaintiffs are not suitable persons to have the custody of the child, and that the best interests and welfare of the child would best be served by leaving the child in the custody of the defendants. They also contend that the plaintiffs have effectively released and relinquished their parental rights to the custody and control of the child through the execution of the instruments hereinbefore referred to.

Because of the seriousness of the questions involved, we shall discuss the facts peculiar to this case more in detail. Plaintiff William C. Brown has a very fine war record. He is manager of a furniture store in San Francisco and a number of witnesses testified as to his good character and habits. On the other hand, the story of plaintiffs' domestic life is not a pleasant one. Mr. and Mrs. Brown both testified that they were married in 1935 at Tia Juana, Mexico, and that because they did not have a certificate of said marriage, and in order to facilitate the collection of Mr. Brown's insurance in case of his death while in the armed forces, they were re-married in San Francisco on October 9, 1942, and received a certificate. The record shows that in 1935 Mr. Brown was married to another woman, who did not obtain a decree of divorce from him until November, 1936, and which divorce did not become final until September, 1938. To refute the inference that Mr. Brown was a bigamist, his counsel advances the suggestion that *possibly* a mistake was made in the

testimony and that the Mexican marriage *could* have taken place in 1936 or 1937 after the former Mrs. Brown secured an interlocutory decree of divorce. No evidence was introduced to this effect. The trial judge, who saw and heard the witnesses, had the following to say in his opinion:

"As to the moral fitness of petitioners, it is clearly established that both failed to tell the truth relative to their 'Mexican marriage.' * * * Petitioners have attempted to deceive the court relative to their 'Mexican marriage.' "

Mrs. Brown testified on cross-examination that she could not remember whether the Mexican marriage was performed by a priest, minister, or justice of the peace. We believe that the trial court was justified in his conclusion in regard to the "Mexican marriage."

Mrs. Brown testified further that after Mr. Brown went overseas, she came to Detroit, where her parents live, and that she became pregnant several months prior to the time Mr. Brown returned. Regarding the cause of her pregnancy, her testimony was to the effect that she had been raped, but the rather flippant manner in which she described the occurrence and the almost overwhelming testimony that the pregnancy was the result of voluntary illicit relations with an undisclosed person while her husband was absent led the trial judge to wholly discredit her story in regard to the alleged rape. The doctor who attended her stated that she told him that the putative father of the child "appealed to me and I had intercourse with him."

Further testimony developed the facts that on October 20, 1944, a month before the child was born, plaintiffs engaged Dr. Michelson, a member of the staff of St. Joseph's Hospital in San Francisco, to

deliver the child, that Mr. Brown stated to the doctor he was willing to pay all the bills, but that he was not the father of the child, and they were not going to keep it. The doctor testified in his deposition and also at a hearing in another proceeding in San Francisco, that Mrs. Brown was present when these statements were made and that she acquiesced therein. He further testified that he had several talks with Mrs. Brown before and after the baby was born in which he urged her to keep the child, but that she stated her husband had told her she must choose between him and the baby, and that she preferred to keep her husband. The doctor testified that Mrs. Brown definitely decided to give up the baby, and he thereupon informed a nurse, who was the anaesthetist at the hospital, that there was going to be a baby available for adoption. The nurse wired her sister, defendant Julia DeWitt, and after several long distance conversations and telegrams, defendants came to San Francisco, were given the custody of the child and returned at once to Michigan. The nurse had been instructed by the defendants to ascertain the health of the child, et cetera, and if its background was satisfactory to "hire the best attorney you can and get everything exactly the way it should be." The nurse consulted the judge of the superior court in San Francisco, who acts as the presiding judge of the juvenile department of said court, and she was referred to an attorney who prepared the document hereinbefore referred to which Mr. and Mrs. Brown signed. The nurse was also given instructions as to the procedure to follow. It was not until the defendants were told that everything was in order that they proceeded to San Francisco to get the baby.

Although plaintiff William C. Brown now joins his wife in the petition for the custody of the child,

when he was importuned to keep the child just prior to the execution of the document referred to by him and Mrs. Brown, he absolutely refused to do so in language too filthy to repeat. The purport of what he said is that if he kept the child he might come home some night "in his cups" and, realizing that the child was not his, might do it great bodily harm.

A showing was made that the neighborhood in which plaintiffs have been living is an undesirable one in which to bring up a child. Plaintiffs assert that because of the housing shortage in San Francisco they were unable to obtain a better place, to live at the time, and Mr. Brown testified that he had completed arrangements for the family to move into adequate quarters in a good neighborhood. Regarding this matter, the trial judge said in his opinion:

"The testimony of Mr. Brown in his deposition on November 29, 1945, that he 'has great love and affection for this child' and that he has now rented a new home, et cetera, are but childish attempts to deceive. He has never seen the child; insisted on its being given up, and on the face of it, such a statement is false. As Mrs. Brown has remained in Michigan since the early summer of 1945, his claim of renting is more than false; it is silly. Even this naive court cannot believe such statements."

Testimony was introduced which seriously reflects on Mr. Brown's conduct while his wife has been away. Respecting the home life of the plaintiffs, Mrs. Brown testified that she did not see her husband for a year prior to the time he entered the service. The doctor, in his deposition, stated that in an interview with Mrs. Brown, she said:

"At one time she said, 'That s. of a b., I left him once,' I am not positive as to the date. It was either on the 30th of October or the 14th of November.

She said, 'I loved him once, went home, and divorced him in Michigan.' She said, 'Son of a bitch.' Those are the words that she used. I was surprised that she would use them. I said, 'I am not interested in that.' She said, 'I left him once,' and then she said, 'He came back there, and he persuaded me to remarry him, and I did.' * * * I said, 'That doesn't mean anything. He was willing to come back to you that time. You can take that baby and wrap it around his little finger.' * * * But it didn't make any impression upon her at all; it didn't make a bit of an impression on her; she didn't want the baby.''

We shall not review the other testimony reflecting on petitioners and tending to show that the judge was correct in reaching the conclusion that the welfare of the child requires denial of the petition.

Defendants, because of the difficulty in securing railroad accommodations at the time, took advantage of an opportunity to return to Michigan the day after they obtained the child. They have no children of their own. They brought the baby into their home, have given it the most loving care and attention and are attached to it the same as if it were their natural child. They have spent over $3,000 in connection with obtaining the child and providing for it. They are people of the highest character; they enjoy the respect of the community in which they live; and they are able and anxious to give the child a fine home, parental love and affection, and bring it up in the very best moral and social environment. Lest there be any misunderstanding, we state the fact that defendants financially are much better off than plaintiffs does not affect our determination.

Plaintiffs assert that they did not know what they were signing when they executed the ''Consent to Adoption'' form. Mr. Brown is a business man who manages a large store. The signing of the form

was the outcome of previous conversations in which
both plaintiffs refused to keep the child although
they were urged to do so. The testimony clearly
shows that they knew what they were doing, and
that their signatures were not obtained by fraud,
duress or mistake. The trial judge found:

"Whatever may or may not be the 'legal' effect
of this paper, it is the opinion of this court that
plaintiffs executed it understandingly. They knew
what it was and what its purpose was."

A reading of the entire record leads us to the same
conclusion. Regarding the legal effect of this docu-
ment, ample authority is cited in 27 Am. Jur. p. 832,
Infants, § 110, for the following statement:

"If the parent has made an agreement with an-
other person surrendering to him the custody of the
child, such agreement may have much weight as
showing the unfitness of the parent and estopping
him from seeking to repudiate a fair and beneficial
agreement; but it will not be enforced as a binding
agreement unless it is for the benefit of the child.
The language of the opinions on this topic differs,
some courts holding such an agreement void as
against public policy, and others treating it as pre-
sumptively valid; but most, if not all, of the deci-
sions can be reconciled by applying the test whether
the agreement in question is favorable or unfavor-
able to the interests of the infant."

As a rule the custody of a child will be left with
the natural parent. This, however, is not an abso-
lute rule, and if the circumstances are such that it
would not be for the good and welfare of a child
to take it away from third parties and give it to the
natural parent, the custody with the third parties
will not be disturbed.

In *Re Gould,* 174 Mich. 663, a leading case often
referred to in this State, the Court said at page 669:

"But the absolute power of the father over his infant children, to treat them as property and dispose of them as he sees fit because they are his, which was once recognized under the Roman law of *patria potestas* and in the codes of early nations, no longer obtains. Parental authority is subordinate to the supreme power of the State. Every child born in the United States has, from the time it comes into existence, a birthright of citizenship which vests it with rights and privileges, entitling it to governmental protection.

" 'And such government is obligated by its duty of protection, to consult the welfare, comfort, and interests of such child in regulating its custody during the period of its minority.' *Mercein* v. *People, ex rel. Barry,* 25 Wend. (N. Y.) 64 (35 Am. Dec. 653.)

"The power of parental control, though recognized as a natural right and protected when properly exercised, is by no means an inalienable one. When the 'right of custody' is involved between respective claimants for a child, the courts, though in the first instance recognizing prima facie rights of relationship, in the final test are not strictly bound by demands founded upon purely technical claims or naked legal rights, but may and should, in making the award, be governed by the paramount consideration of what is really demanded by the best interests of the child. *Corrie* v. *Corrie,* 42 Mich. 509; *In re Heather Children,* 50 Mich. 261; *Chapsky* v. *Wood,* 26 Kan. 650 (40 Am. Rep. 321); *Richards* v. *Collins,* 45 N. J. Eq. 283 (17 Atl. 831, 14 Am. St. Rep. 726)."

The superior right of the parents to the child should only be enforced when it accords with the best interest of the child. *In re Solosth,* 157 Mich. 224; *In re Knott,* 162 Mich. 10; *Martin* v. *Benzie Circuit Judge,* 200 Mich. 549; *Greene* v. *Walker,* 227 Mich. 672.

In *Riede* v. *Riede,* 300 Mich. 300, Mr. Justice BOYLES speaking for the Court said:

"The right of the mother to have the custody of a child under 12 years of age, by virtue of the statute (3 Comp. Laws 1929, § 12852 [Stat. Ann. § 25.311]), is not absolute. The wishes of the parents are a secondary consideration. The welfare of the child is paramount. *Weiss* v. *Weiss,* 174 Mich. 431; *Smith* v. *Ritter,* 292 Mich. 26. The court may award custody of the child to a third person and require the father to pay for her support. Revised Statutes 1846, chap. 84, § 17a, as added by Act No. 255, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 12739–1, Stat. Ann. 1941 Cum. Supp. § 25.97[1])."

Also, see *Riemersma* v. *Riemersma,* 311 Mich. 452.

The trial court came to the correct conclusion, and we affirm his order denying the petition for habeas corpus and dismissing the writ. Defendants will recover costs.

BUSHNELL, C. J., and SHARPE, BOYLES, REID, NORTH, and CARR, JJ., concurred. DETHMERS, J., did not sit.