*In re* MARK T.

1. BASTARDS—CUSTODY—FATHER—FITNESS.
    Illicitness of relationship between father and mother of illegitimate child does not preclude an award of custody of the child to the father.

2. PARENT AND CHILD—RELEASE BY UNWED MOTHER.
    A release of child to a licensed child placement agency, signed voluntarily by unwed mother in manner provided by statute, permanently terminates her rights in the child (CLS 1961, § 710.3).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 10 Am Jur 2d, Bastards § 62.
[2] 2 Am Jur 2d, Adoption § 25; 10 Am Jur 2d, Bastards § 61.
[3] 2 Am Jur 2d, Adoption §§ 3, 48.
[4, 14–17] 10 Am Jur 2d, Bastards § 64.
[5] 2 Am Jur 2d, Adoption §§ 23–25, 53; 20 Am Jur 2d, Courts § 104.
[6] 2 Am Jur 2d, Adoption §§ 58, 59, 61.
[7] 20 Am Jur 2d, Courts § 104.
[8] 2 Am Jur 2d, Adoption §§ 58, 59, 61; 10 Am Jur 2d, Bastards § 64; 20 Am Jur 2d, Courts § 104.
[9–12] 10 Am Jur 2d, Bastards §§ 60–62.
    Right of putative father to custody of illegitimate child.  37 ALR2d 882.
[13] 10 Am Jur 2d, Bastards § 63.
[18, 19] 2 Am Jur 2d, Adoption §§ 23–25.
    Necessity of securing consent of · parents of illegitimate child to its adoption.  51 ALR2d 497.
[20–22] 10 Am Jur 2d, Bastards § 64; 20 Am Jur 2d, Courts § 17; 27 Am Jur, Infants § 105.
[23] 2 Am Jur 2d, Adoption §§ 3, 5.
[24] 2 Am Jur 2d, Adoption §§ 3, 5; 10 Am Jur 2d, Bastards § 64; 20 Am Jur 2d, Courts § 17; 27 Am Jur, Infants § 105.
[25] 2 Am Jur 2d, Adoption § 3.
[26] 10 Am Jur 2d, Bastards § 60.
[27] 10 Am Jur 2d, Bastards § 62.
[28–31] 10 Am Jur 2d, Bastards §§ 60–64.
[32] 2 Am Jur 2d, Adoption §§ 58, 59.
[33] 10 Am Jur 2d, Bastards §§ 62, 64.
[34] 5 Am Jur 2d, Appeal and Error § 760.
[35] 5 Am Jur 2d, Appeal and Error § 1009.

3. SAME—ADOPTION STATUTE—CUSTODY DISPUTES.

The adoption statute does not purport to provide a procedure for resolving child custody disputes (CL 1948, § 710.1 *et seq.*, as amended).

4. SAME—ADOPTION—TERMINATION ORDER—HABEAS CORPUS—COLLATERAL ATTACK.

Application for habeas corpus to determine custody of illegitimate child by father of illegitimate child after a termination order has been entered by the probate court, terminating the rights of the child's natural parents, is not a collateral attack on the termination order, because in entering the termination order the probate court could not have adjudicated the claim advanced in the petition for a writ of habeas corpus '(CLS 1961, § 710.6).

5. COURTS—PROBATE COURT—ADOPTION—TERMINATION ORDER.

Probate court is limited either to signing or refusing to sign a termination order terminating the rights of the child's natural parents or persons *in loco parentis* in adoption proceedings, to which consent has been given by those whose consent is statutorily required (CLS 1961, § 770.3).

6. ADOPTION—SUITABILITY OF PERSONS OPPOSING ADOPTION—BEST INTEREST OF CHILD.

Probate court might properly consider the parental suitability of one opposing adoption who is *in loco parentis,* in considering whether the proposed adoption will serve the best interest of the child, and could perhaps upon such review refuse to enter a termination order.

7. COURTS—PROBATE COURT—POWER.

A probate court is a court of limited jurisdiction, without inherent power, and possessing only those powers prescribed by the Constitution and by statute.

8. SAME—PROBATE COURT—CUSTODY OF CHILD.

Probate court does not have the power to direct a child placement agency to deliver custody of a child to one formerly *in loco parentis* or, without the consent of the placement agency or, possibly, of the Michigan children's institute, to enter a termination order or to approve a petition for adoption by one formerly *in loco parentis.*

9. BASTARDS—CUSTODY.

Resolution of disputes as to the custody of legitimate and illegitimate children has developed along parallel lines,

10. SAME—CUSTODY.

Primary right to custody of illegitimate children belongs to the mother, and her right is good against all including the putative father; the father has a custody right good against all but the mother.

11. SAME—CUSTODY—WELFARE OF CHILD.

Primary right of the mother and the secondary right of the father to custody of an illegitimate child is to be subordinated to the very same fundamental consideration as that used in resolving child custody disputes concerning legitimate children, namely, the welfare of the child.

12. SAME—CUSTODY—PUTATIVE FATHER.

A court may award custody of an illegitimate child to its father, in preference to its mother, if it is deemed in the child's best interest to do so.

13. PARENT AND CHILD—CUSTODY—THIRD PERSONS.

Court may award custody of legitimate or illegitimate children to third parties in preference to either parent where, by reason of parental unfitness, or the establishment of a dominant relationship with a third person, it appears that such result is in the best interest of the child.

14. HABEAS CORPUS—CHILD CUSTODY—EQUITY.

Habeas corpus is a proper remedy to determine controversies concerning a child's custody, and where the writ is sought to invoke the court's jurisdiction in a custody dispute, the proceedings have the incidents of a suit in equity.

15. SAME—CHILD CUSTODY—ISSUES.

The inquiry in a habeas corpus proceeding to determine custody of a child is not restricted to the legality of detention of the child, but concentrates on what will best serve the interest of the child, and the chancellor considers all the rights, claims, evidence, relationships, and imponderables in resolving a custody dispute.

16. SAME—CHILD CUSTODY—PRIOR ORDERS OF OTHER COURTS.

The chancellor considers, but is not necessarily bound by, prior orders of other courts in deciding a habeas corpus proceeding for custody of a child.

17. PARENT AND CHILD—CHILD CUSTODY—FAMILY RELATIONSHIP.

An established family relationship is ordinarily to be preferred and protected in deciding custody of both legitimate and illegitimate children.

18. ADOPTION—CONSENT—ILLEGITIMATE CHILD.

Adoption statute requires consent to adoption by both parents of legitimate child, and only that of the mother where the child is not legitimate, in order to establish a workable adoption program (CLS 1961, § 710.3).

19. SAME—CONSENT OF MOTHER—ILLEGITIMATE CHILD.

Consent of mother to adoption, which alone is required to authorize adoption of an illegitimate child, cannot finally resolve a dispute concerning the custody of her child, where the father of the child wishes to have custody (CLS 1961, § 710.3).

20. COURTS — CIRCUIT COURT — CHANCERY POWER — JURISDICTION — CHILDREN.

Circuit courts possess the general and historic chancery power over children and their custody, except to the extent that original jurisdiction of juvenile delinquents and dependents has been vested in the juvenile courts.

21. SAME—CIRCUIT COURT—CHANCERY POWER—CHILDREN.

Circuit court, deciding habeas corpus proceeding to determine custody dispute concerning illegitimate child *held,* to enjoy the same equitable jurisdiction to decide custody disputes as it exercises in disputes concerning legitimate children.

22. SAME—CIRCUIT COURT—CHANCERY POWER—CHILDREN—ADOPTION.

Power of circuit court, acting in chancery to determine custody of child in habeas corpus proceeding, *held,* to remain in the circuit court upon the release of the child for adoption, upon consent of a placement agency to a petition for adoption, and even upon the entry by the probate court of a termination order terminating the rights of the natural parents or those *in loco parentis* (CLS 1961, §§ 710.3, 710.6).

23. ADOPTION—CONSTRUCTION OF STATUTES.

The adoption statute may not properly be construed so as to create a vacuum of judicial power in the circuit court in connection with the matter of custody of children (CL 1948, § 710.1 *et seq.,* as amended).

24. SAME—PROBATE CODE—POWERS OF CIRCUIT COURT.

Chapter of probate code dealing with adoption and change of names of minors *held,* not to deprive the circuit court of its historic and comprehensive power to decide custody disputes concerning children, legitimate and illegitimate (CL 1948, § 710.1 *et seq.,* as amended).

25. SAME—PUBLIC POLICY.

No public policy favors adoption in all cases without regard to the particular facts.

26. BASTARDS—PARENT AND CHILD RELATIONSHIP.

Relationship of an illegitimate child to those who assume the parental role may be important and meaningful to the child, and should not be subject to termination at the judicially unreviewable fiat of the mother and a placement agency.

27. SAME—LEGITIMATION OF ILLEGITIMATE CHILD—JURISDICTION OF CIRCUIT COURT.

The failure of the father of an illegitimate child to legitimize the child pursuant to statutes permitting him to do so does not deprive the circuit court of the power to award custody to the father, although such failure may be considered in weighing all factors relevant to the best interests of the child (CL 1948, § 702.83, as amended by PA 1965, No 162; CLS 1961, §§ 722.714, 722.717, as amended by PA 1962, No 238).

28. PARENT AND CHILD—CUSTODY—FITNESS.

Trial court may not compare the parental home with a proposed alternative home in deciding a custody dispute between a natural parent and a third party.

29. SAME—CUSTODY—FITNESS.

Circuit court, in a habeas corpus action for custody of an illegitimate child, held, not obliged to compare a proposed adoptive home for the child with the home of the natural father, seeking custody of the child in the proceeding.

30. SAME—CHILD CUSTODY—FINDING OF TRIAL COURT.

Finding of trial court in habeas corpus action by natural father for custody of illegitimate child whose mother had released the child for adoption, that the father was a fit and suitable parent held, based on substantial evidence and not clearly erroneous.

31. SAME—CHILD CUSTODY—DELAY.

Finding of trial court that natural father of illegitimate child, seeking its custody in habeas corpus action against adoption agencies, acted promptly to obtain custody of the child, held, amply supported by testimony, where mother secretly released child to adoption agency after preliminary negotiations, with neither agency nor mother telling the father, and the father, upon finding that the child was gone, made immediate inquiry and carried on an unceasing effort to find the whereabouts of the child and to recover him.

32. ADOPTION—STATUTORY INVESTIGATION—FATHER OF ILLEGITIMATE CHILD.

> Statutorily required investigation to be conducted at the direction of the probate court upon presenting of a petition of adoption should reveal whether there has been established a viable familial relationship between an illegitimate child and his father, and if there is such a relationship, the question whether custody should be transferred to a father desiring custody is a matter which the circuit court has the power to resolve (CL 1948, § 710.1 *et seq.*, as amended).

33. BASTARDS—CUSTODY OF CHILD—FITNESS OF FATHER.

> Award of custody to father of illegitimate child by trial court in habeas corpus proceeding for custody of child *held*, correctly made, where evidence showed that father and mother had lived together after the birth of the child until he was approximately a year and a half old, that father is proper person to care for and have custody of the child, and that he can provide the love of a parent and a suitable home for the child.

34. SAME—CONCEALMENT OF FAMILIAL RELATIONSHIP—FRAUD.

> The possibility of fraud being practiced by an unwed mother through concealment of the fact of a familial relationship between the child and the father is not considered on appeal in child custody dispute which arose when the father sought custody of the child after the mother had released the child for adoption, and fraud appears to have been absent.

35. COSTS—PUBLIC QUESTION—CUSTODY OF ILLEGITIMATE CHILD.

> No costs are awarded in appeal by probate judge and social agencies from order of circuit court awarding custody of illegitimate child to father, a public question being involved.

Appeal from Wayne; Bohn (Theodore R.), J. Submitted Division 1 June 9, 1967, at Detroit. (Docket No. 3,453.) Decided November 17, 1967.

Habeas corpus by the father of Mark T., an illegitimate child, against James H. Lincoln, Judge of the Probate Court for the County of Wayne, Juvenile Division, Catholic Charities and Catholic Social Services of Wayne County, and Family Services of Metropolitan Detroit, to determine custody of the

child. Custody awarded to the father. Defendants appeal. Affirmed.

*Gregory M. Pillon,* for plaintiff father.

*William L. Cahalan,* Prosecuting Attorney and *Aloysius J. Suchy, Lawrence O. Hinkle,* and *Gary R. La Bret,* Assistant Prosecuting Attorneys, for defendant James H. Lincoln, Wayne county judge of probate.

*Henry J. Meurer,* for defendants Catholic Charities and Catholic Social Services of Wayne County.

*Anthony P. Marchese* and *Harry Klein,* for defendant Family Services of Metropolitan Detroit.

LEVIN, J. This appeal from an order granting a writ of habeas corpus presents the question whether the circuit court has the power to award custody of an illegitimate child to the child's father after a probate court has entered a termination order in connection with the proposed adoption of the child following the child's release for adoption by the mother to a licensed child placement agency. A termination order is an order entered pursuant to CLS 1961, § 710:6 (Stat Ann 1962 Rev § 27.3178 [546]) after a petition for adoption has been filed, investigated and has received the required consent.[1]

---

[1] Here the consent was given by the licensed child placement agency to which the child had been released for adoption. The order terminates the rights of the child's natural parents or the persons *in loco parentis.* The probate registrar testified that where, as here, the mother has released the child for adoption the intent and effect of the order is to terminate the agency's rights.

I.

Mark was born in Detroit on February 2, 1965. His father was Mr. S and his mother Miss M. The relationship between Mark's parents began in April, 1963. Sometime during the term of the pregnancy and until August 2, 1966 they lived together as Mr. and Mrs. S and raised Mark as Mark S, but never married. In Michigan common-law marriages cannot be contracted after January 1, 1957. CLS 1961, § 551.2 (Stat Ann 1957 Rev § 25.2). Mr. S paid all the confinement expenses and supported the family until Miss M left him taking Mark with her.

Mr. S holds a bachelor's degree in electrical engineering and has been employed by his present employer for 12 years, currently earning $18,000 a year. He served honorably in the United States army as an officer. Miss M graduated from high school and has from time to time worked in various business offices. Prior to her relationship with Mr. S, she had, on July 24, 1958, given birth to another illegitimate child who during her familial relationship with Mr. S lived with Miss M's parents.

After Miss M became pregnant Mr. S purchased an engagement ring which Miss M wore and he asked her to marry him. He testified he hoped that in time she would accept her responsibility as a mother both to their child and her first born and that they would all live together.

The circuit judge found that Mr. S had demonstrated a sincere interest and love for Mark, that he had made every effort to induce Miss M to marry him, that he is competent and fit and a proper person to care for and have custody of the child and that he can provide the love of a parent and a suitable home for the child.

Appellants stress the illicitness of the relationship between Mr. S and Miss M as bearing on his fitness.

Whatever relevance the nature of their relationship may have on the matter, it does not preclude an award of custody. *In re Petition of Dickholtz* (1950), 341 Ill App 400 (94 NE2d 89, 91); *State, ex rel. Guinn,* v. *Watson* (1946), 210 La 266 (26 So 2d 740, 743); *Ware* v. *Muench* (1935), 232 Mo App 41 (89 SW2d 707, 715); *Commonwealth, ex rel. Pressens,* v. *Siegler* (1950), 167 Pa Super 598 (76 A2d 454, 456); *Guardianship of Smith* (1954), 42 Cal 2d 91 (265 P2d 888, 37 ALR2d 867).

Some time prior to August 2, 1966, Miss M decided to place Mark for adoption. She confided in representatives of a licensed child placement agency but not in Mr. S. The agency learned the history of the relationship between Mr. S and Miss M and that Mark had lived with both of them since birth. The agency did not communicate with Mr. S during the four-month period of its consideration and investigation of Miss M's application. On August 2, 1966, without intimation to Mr. S of what was about to occur, Miss M released Mark to the agency for adoption. The release was signed in the manner provided by CLS 1961, § 710.3 (Stat Ann 1962 Rev § 27.3178[543]). A voluntary release permanently terminates the mother's rights in the child. *Gonzales* v. *Toma* (1951), 330 Mich 35.

Three days after Miss M left with Mark, the proposed adoptive parents filed their petition for adoption. An agency representative testified that the child was "placed" shortly thereafter. Mr. S testified that some weeks after Miss M left him the representative told him the child was already in the hands of the adoptive parents.[2] The placement

---

[2] The probate court registrar testified that under current practice the placement agency could have delivered physical possession of the child to the proposed adoptive parents at any time after the filing of their petition for adoption on August 5, 1966, and that normally this is done prior to the entry of the termination order. See CL 1948, § 710.12 (Stat Ann 1962 Rev § 27.3178[552]) providing that

agency consented to the petition for adoption, the Wayne county juvenile officer conducted the statutorily required investigation and the probate judge signed an order of termination on November 28, 1966. Mr. S filed his petition for a writ of habeas corpus on December 13, 1966.

When Mr. S came home on August 2, 1966, he discovered both Miss M and Mark were gone. He immediately inquired of her parents and made what the trial court found to be an unceasing effort to recover the child. The record discloses that Mr. S spoke to various representatives of the juvenile court and of several social agencies, including the agency to which the child had been released, that he was directed from one agency to another, that he was persistent and diligent in his efforts to locate Mark.

Mr. S testified that Miss M never informed him of the child's location and that those with whom he spoke in an effort to locate Mark refused information as to who had physical custody or jurisdiction of the child. After Mr. S learned the name of the placement agency to which the child had been released he asked that agency to consider him as a possible adoptive parent. He estimates he made roughly 30 or 40 personal visits to various agencies and officials. He also testified to a large number of telephone conversations.

The registrar of the probate court and others advised Mr. S that he had no legal rights. The registrar testified that, although he gave this advice based on his own personal understanding of the law, he recommended that Mr. S obtain the advice of legal counsel. Mr. S testified that he made an effort to retain counsel but that several attorneys were discouraging in their advice. He eventually obtained

---

no child shall be placed in any home for the purpose of adoption until entry of a termination order.

legal counsel and commenced these proceedings. The circuit judge found that Mr. S proceeded promptly to obtain custody of the child and the record supports that finding.

On February 17, 1967, the circuit judge entered an order granting the writ of habeas corpus. On March 17, 1967, this Court granted the application for leave to appeal of defendants, Honorable James H. Lincoln, judge of the probate court for the county of Wayne, juvenile division, Catholic Charities and Catholic Social Services of Wayne County, and Family Services of Metropolitan Detroit.

## II.

The defendants contend this proceeding constitutes a collateral attack on the termination order entered by the probate court. We do not agree with that analysis. The adoption statute does not purport to provide a procedure for resolving child custody disputes. In entering the termination order the probate court did not and could not have adjudicated the claim advanced in the petition for a writ of habeas corpus. The termination order was entered pursuant to chapter 10 of the probate code of 1939, which provides a procedure for adoption:

Any person who shall desire to adopt a minor child shall file a petition with the probate court of the county wherein the petitioner resides. CL 1948, § 710.1 (Stat Ann 1962 Rev § 27.3178[541].)

In the case of a child born out of wedlock the consent of the mother to such adoption is required, except that where, as here, the child has been released by the mother for the purpose of adoption, then the consent shall be "by the duly authorized representative of the Michigan children's institute, or a placement agency licensed by the State to whom the child has been released, if said child has been so re-

leased."[3]    CLS 1961, § 710.3 (Stat Ann 1962 Rev § 27.3178[543].)

The court is required to direct a full investigation. CLS 1961, § 710.5 (Stat Ann 1962 Rev § 27.3178 [545].)

If upon examination of the investigative report the judge of probate is satisfied as to

(i) the genuineness of the consent to adoption,

(ii) the good moral character, ability to support and educate the child, and the suitableness of the home of the person or persons adopting the child for the child,

(iii) the mental and physical condition of the child as a proper subject for adoption in said home,

(iv) that the best interests of the child will be served by said adoption,

he shall forthwith enter an order (the "termination order") terminating the rights of the child's natural parents or the persons *in loco parentis* and the child shall thereupon be deemed a ward of said court. CLS 1961, § 710.6 (Stat Ann 1962 Rev § 27.3178 [546].)

One year after the entry of such an order (or earlier under certain circumstances) the court may enter an order of adoption. CL 1948, § 710.7 (Stat Ann 1962 Rev § 27.3178 [547].)

It will be observed that under the statutory scheme the probate court is limited either to signing or refusing to sign a termination order to which consent has been given by those whose consent is statutorily required. While the probate court might properly consider the parental suitability of one

─────────

[3] *Quaere*, whether the required consent may be given by the Michigan Children's Institute, established pursuant to CL 1948, § 400.201 *et seq.*, as amended (Stat Ann 1957 Rev § 25.381 *et seq.*), as to a child released to a licensed child placement agency where the agency refuses or fails to consent to an adoption petition or has consented to a competing petition for adoption.

opposing adoption who was *in loco parentis,* under the clause which directs the probate court to consider whether the proposed adoption will serve the best interests of the child, and could perhaps upon such review *refuse* to enter a termination order, the probate court, being a court of limited jurisdiction, without inherent power and possessing only those powers prescribed by the Constitution and by statute,[4] does not have the power to direct the child placement agency to deliver custody of the child to one formerly *in loco parentis* (such as Mr. S) or, without the consent of the placement agency or, possibly, of the Michigan children's institute (see footnote 3), to enter a termination order or to approve a petition for adoption by one formerly *in loco parentis.*

Apart from its power to approve or disapprove a petition for adoption, the probate court has jurisdiction concerning the custody of delinquent, neglected, or dependent children under chapter 12A of the probate code (CL 1948, § 712A.2, as amended by PA 1965, No 182 [Stat Ann 1965 Cum Supp § 27.3178(598.2)]).[5] It has not been suggested that Mark was such a child or that such jurisdiction of the probate court was, or could be, here invoked.[6]

---

[4] *Fritts* v. *Krugh* (1958), 354 Mich 97, 112; *In re Graham's Estate* (1936), 276 Mich 321, 323; *In re Estate of Meredith* (1936), 275 Mich 278, 289; *In re Winter's Estate* (1941), 297 Mich 294, 301.

[5] Under the provisions of chapter 12A of the probate code, the probate court may enter temporary orders pertaining to the care or custody of delinquent, neglected, or dependent children and orders placing the permanent custody of such a child in the court itself in which event all parental rights are terminated. CL 1948, § 712A.20, as amended by PA 1966, No 181 (Stat Ann 1966 Current Material § 27.3178 [598.20]). For the Michigan constitutional provision concerning probate court's power over juvenile delinquents and dependents, see Const 1963, art 6, § 15. See, also, *Sovereign* v. *Sovereign* (1958), 354 Mich 65.

[6] Compare *In re Welfare of Baby Boy Shady* (1962), 264 Minn 222, 230 (118 NW2d 449, 454): "Illegitimacy of itself is not dependency"; *In re Gould* (1913), 174 Mich 663, 666; and *Caruso* v. *Superior Court in and for County of Pima* (1966), 100 Ariz 167 (412 P2d 463).

The central question here is whether the circuit court, in deciding conflicting custody claims, possesses the same power with respect to illegitimate children which it possesses with respect to legitimate children, and, if it does, whether such power ceases upon either (i) a release of the illegitimate child by the child's mother to a licensed child placement agency for adoption, or (ii) the proposed adoptive parents' filing a petition with the probate court seeking the adoption of the illegitimate child and the filing of a consent to that petition by the child placement agency, or (iii) the probate court's entry of a termination order.

The historical development of the common law concerning custody of illegitimate children has been summarized by one author:

"The ancient rule at common law as to the custody of illegitimate children, which came within the doctrine of *filius populi,* provided that the custody of such a child was in the hands of the parish. The rule was first modified to the extent of excluding only the putative father from custody and placing the exclusive right to custody in the mother. The right of custody in many common-law jurisdictions was subsequently extended to include the putative father and occasionally to third parties. *The almost universal rule in custody cases involving legitimate children, that the best interest of the child governs the award of custody, has been extended in a majority of jurisdictions to include illegitimate children.*

"In general, the trend toward liberalization in the granting of custody has not been as readily applied to visitation privileges, although they are considered a form of custody. The mother's right to access has been granted in a few jurisdictions, but the putative father's visitation privileges have generally been confined to cases where the father had either legitimatized or acknowledged the child." See Domestic Relations—Illegitimate Child—Visitation Rights

Granted to Putative Father, 26 Albany LR 335
(1962). (Emphasis supplied.)[7]

Originally, in English law, the illegitimate child
was the ward of the parish because, in one of the less
charming fictions of our early common law, he did
not exist.

"The common law of England did not contemplate
illegitimacy and, shutting its eyes to the facts of life,
described an illegitimate child as *filius nullius*."
*Galloway* v. *Galloway* (1955, HL), [1956] AC 299,
310, 311 (3 All Eng Rep 429, 431).

During those early times when it was said that a
putative father could not have custody of his illegit-
imate child and the child was a ward of the parish,[8]
it would never have occurred to anyone that a
woman could enjoy custody rights, as then, at com-
mon law, the father had the absolute right to the
custody of his legitimate children.

"The English father might, if he wished, deny
the mother access to the child during his life. * * *
And even after death his withered hand might pre-
vent their reunion through his appointment of a tes-
tamentary guardian." *Sovereign* v. *Sovereign*
(1958), 354 Mich 65, 74 (concurring opinion).

It was in such a rigid conceptual atmosphere that
equity originally began, in "rare cases," to exercise

───────────

[7] Visitation rights were awarded to the father of an illegitimate
child in *People, ex rel. Francois*, v. *Ivanova* (1961), 14 App Div 2d
317 (221 NYS2d 75), in *Matter of Anonymous*, 12 NY Misc 2d 211
(172 NYS2d 186), in *Ex parte Hendrix* (1940), 186 Okla 712 (100
P2d 444), and in *Baker* v. *Baker* (1913), 81 NJ Eq 135 (85 A 816).
Visitation rights were awarded to the mother of an illegitimate
child in *People, ex rel. Meredith*, v. *Meredith* (1947), 272 App Div
79 (69 NYS2d 462), aff'd 297 NY 692 (77 NE2d 8); in *People ex
rel. Lewisohn*, v. *Spear* (1940), 174 Misc 178 (20 NYS2d 249); *Com-
monwealth, ex rel. Kennedy*, v. *Button* (1942, Pa), 53 Dauph Co
320.

[8] *Horner* v. *Horner* (1799), 1 Hag Con 337, 351 (161 Eng Rep
573, 578); *Barnardo* v. *McHugh* (1891, HL), [1891] AC 388, 398,

jurisdiction for the protection of the legitimate child
from a patently unfit father. As the law developed
and the mother obtained custody rights, the courts
of chancery assumed jurisdiction to settle custody
disputes between parents. *Sovereign* v. *Sovereign,
supra.* With respect to illegitimate children, the
doctrine of *filius populi* was modified to recognize
first in the mother, and later in the father, rights of
custody. However, "rights" in children are relative,
not absolute. They are merely guidelines to the
exercise of judicial discretion. In 1879, our Su-
preme Court declared:

"In contests of this kind the opinion is now nearly
universal that neither of the parties has any rights
that can be allowed to seriously militate against the
welfare of the child. The paramount consideration
is what is really demanded by its best interests."
*Corrie* v. *Corrie* (1879), 42 Mich 509, 510.

Our examination of the decisional authorities con-
vinces us that the resolution of disputes as to the
custody of legitimate and illegitimate children has
developed along parallel lines although such parallel
development has been obscured by the fact that it
was not coincident in time. At about the same time[9]
that the mother came to enjoy joint custody with the
father of legitimate children, it was commonplace
to state that the primary right to custody of illegiti-
mate children belongs to the mother and that her
right is good against all including the putative
father, or, conversely, the father has a custody right
good against all but the mother.[10] Annotations:

[9] Compare the cases cited in the footnote on page 75 of the con-
curring opinion in *Sovereign* v. *Sovereign, supra,* with *Rex* v. *Soper*
(1793), 5 T R 278 (101 Eng Rep 156), and *Barnardo* v. *McHugh,
supra.*

[10] In the following cases the father was awarded custody in pref-
erence to other relatives of the child. *Hayes* v. *Strauss* (1928), 151
Va 136 (144 SE 432); *Lewis* v. *Crowell* (1923), 210 Ala 199 (97
So 691; *Fierro* v. *Ljubicich* (1957), 5 Misc 2d 202 (165 NYS2d

Right of mother to custody of illegitimate child, 98 ALR2d 417, 427, 431; Right of putative father to custody of illegitimate child, 37 ALR2d 882.

It is a familiar principle that the most important consideration in resolving child custody disputes concerning *legitimate* children is the welfare of the child.[11] It is now just as universally recognized in deciding a dispute concerning custody of an *illegitimate* child that the primary right of the mother and the secondary right of the father are to be subordinated to the very same fundamental consideration.[12] Indeed, in 1891 the House of Lords ques-

290); *Aycock* v. *Hampton* (1904), 84 Miss 204 (36 So 245, 65 LRA 689, 105 Am St Rep 424); *Commonwealth, ex rel. Human,* v. *Hyman* (1949), 164 Pa Super 64 (63 A2d 447); *Guardianship of Smith, supra.* Other relatives prevailed in *State, ex rel. Smith,* v. *Superior Court* (1945), 23 Wash 2d 357 (161 P2d 188); *Commonwealth, ex rel. Harper,* v. *Fuller* (1940), 142 Pa Super 98 (15 A2d 518).

See, also, 10 Am Jur 2d, Bastards, § 62; The Illegitimate Father, 3 Journal of Family Law 321 (1963); Father of an Illegitimate Child—His Right to be Heard, 50 Minn L R 1071 (1966). We have considered but find it unnecessary to decide whether CLS 1961, § 703.6 (Stat Ann 1962 Rev § 27.3178[206]) provides a statutory basis for recognition of custody rights in the undisputed father of an illegitimate child. Compare *Dellinger* v. *Bollinger* (1955), 242 NC 696 (89 SE2d 592), and *Galloway* v. *Galloway* (1955, HL), [1956] AC 299, 310 (3 All Eng Rep 429, 431).

[11] *Sawyer* v. *Sawyer* (1945), 312 Mich 524; *In re Ernst* (1964), 373 Mich 337; *Brown* v. *DeWitt* (1948), 320 Mich 156; *Corrie* v. *Corrie, supra; Johnson* v. *Johnson* (1947), 318 Mich 21.

[12] Annotation: Right of mother to custody of illegitimate child, 98 ALR2d 417, 421. This principle has been applied in cases where the mother prevailed against the father, *Ex parte Hendrix, supra; Commonwealth, ex rel. Beil,* v. *Fisler* (1946, Pa), 58 Dauph Co 174; where the father prevailed against the mother, *People, ex rel. Kessler,* v. *Wehnert* (1952, Sup), 114 NYS2d 598; *Commonwealth, ex rel. Kennedy,* v. *Button, supra; Garrett* v. *Mahaley* (1917), 199 Ala 606 (75 So 10); *Matter of Virginia Norman* (1960), 26 Misc 2d 700 (205 NYS2d 260); *People, ex rel. Lewisohn,* v. *Spear, supra;* where the mother prevailed against third parties, *In re Mrs. M* (1962), 74 NJ Super 178 (181 A2d 14); *Commonwealth, ex rel. Self,* v. *Self* (1943), 153 Pa Super 443 (34 A2d 263) (father's elderly aunt); *Matter of New York Association for Jewish Children* (1943), 182 Misc 651 (44 NYS2d 879); and where third parties prevailed against the mother, *People, ex rel. Coage,* v. *Colbert* (1947, Sup), 75 NYS2d 865 (father's sister); *Commonwealth, ex rel. Lewis,* v. *Tracy* (1944), 155 Pa Super 257 (38 A2d 405) (maternal grandmother and stepgrandfather); *Jackson* v. *Farmer* (1945), 247 Ala 298 (24 So 2d 130) (maternal grandmother); *Commonwealth, ex rel. Shelton,* v. *Bush* (1943), 152

tioned whether any absolute rule had been or could be laid down. The court distinguished earlier cases on their facts, concluded that the mother of an illegitimate child did not have an absolute right to its custody and declared that, while the mother's wishes were primarily to be consulted, the court exercises its equitable jurisdiction with "a view to the benefit of the child." *Barnardo* v. *McHugh* (1891, HL), [1891] AC 388.

The right to custody of children is academic unless there is a dispute concerning their custody. Whether married or unmarried, parents who have and raise children in a family environment do not act on or assert "rights" to custody, primary, secondary, or joint. Such rights are not asserted until death, divorce, or separation occurs. When such an event does occur, then either as a matter of course or by agreement of the parents or, if need be, by court order, the mother normally assumes or is awarded custody in preference to the father, irrespective of whether the child is legitimate, and, if not, then the father takes custody. Just as a court may award custody of a legitimate child to its father in preference to its mother, if it is deemed in the child's best interests to do so, so the court may enter a like order as to an illegitimate child.[13]

---

Pa Super 580 (33 A2d 57); *Ex parte Parker* (1945), 195 Okla 224 (156 P2d 584); *Mitchell* v. *Davis* (1962), 24 Conn Supp 76 (186 A2d 811) (father's mother).

[13] *People, ex rel. Meredith,* v. *Meredith, supra; Commonwealth, ex rel. Hampsey,* v. *Grado* (PA, 1962), 62 Lack Jur 185; *Matter of Virginia Norman, supra; Garrett* v. *Mahaley, supra; People, ex rel. Kessler,* v. *Wehnert, supra; Commonwealth, ex rel. Kennedy,* v. *Button, supra; People, ex rel. Lewisohn,* v. *Spear, supra.* There is authority to the contrary, *e.g., Cleaver* v. *Johnson* (1948, Tex Civ App), 212 SW2d 197. However, the supreme court of Texas recognizes its rule is not followed in other States and explains its rule on historical grounds stating that even today under the law of Texas "a father is not under a common-law or statutory duty to support his illegitimate child." *Home of the Holy Infancy* v. *Kaska* (1965, Tex), 397 SW2d 208, 210.

Similarly, the court can award custody of legitimate[14] or illegitimate children[15] to third parties in preference to either parent, where by reason of parental unfitness or the establishment of a dominant relationship with a third person, family or nonfamily, it appears that such a result is in the best interest of the child.

Our examination of the cases convinces us that most courts have in fact resolved child custody disputes concerning illegitimate children on the basis of precisely the same considerations as are applied in deciding such controversies in respect to legitimate children, although the results as to illegitimate children have at times been explained in terms of "primary" and "secondary" rights.

"The cardinal principle that the welfare of a child should determine its custody is applicable to illegitimate as well as legitimate children." 10 Am Jur 2d, Bastards, § 60.[16]

Habeas corpus is a proper remedy to determine controversies concerning a child's custody. Where

[14] *Greene* v. *Walker* (1924), 227 Mich 672; *In re Brown* (1955), 343 Mich 69, *Johnson* v. *Johnson, supra; Painter* v. *Bannister* (1966), 258 Iowa 1390 (140 NW2d 152), certiorari denied (1967), 385 US 949 (87 S Ct 317, 17 L ed 2d 227); *Halstead* v. *Halstead* (1966), 259 Iowa 526 (144 NW2d 861). See Levine, Child Custody: Iowa Corn and the Avant Garde, 1 Family LQ 3 (1967); Foster & Freed, Child Custody (1964); 39 NYU L R 423 (Part 1); 39 NYU L R 615 (Part 2); Comment, Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties (1963), 73 Yale L J 151.

[15] Family members prevailed against the mother of an illegitimate child in *Jackson* v. *Farmer, supra; Mitchell* v. *Davis, supra; People, ex rel. Coage,* v. *Colbert, supra* (father's sister); *Arnd't* v. *Prose* (1957, Fla), 94 So 2d 818 (father's sister); *Commonwealth, ex rel. Shelton,* v. *Bush, supra* (cousin and her husband); nonfamily members prevailed against the mother in *Ex parte Parker, supra; State, ex rel. Bennett,* v. *Anderson* (1946), 129 W Va 671 (41 SE2d 241); *State, ex rel. Guinn,* v. *Watson, supra.*

[16] See, also, *Baker* v. *Baker, supra; In re Welfare of Baby Boy Shady, supra; Commonwealth, ex rel. Human,* v. *Hyman, supra; People, ex rel. Meredith,* v. *Meredith, supra; Matter of Virginia Norman, supra; People, ex rel. Lewisohn,* v. *Spear, supra; State, ex rel. Guinn,* v. *Watson, supra; State, ex rel. Smith,* v. *Superior Court, supra; Mitchell* v. *Davis, supra.*

the writ is employed to invoke the court's jurisdiction to resolve a custody dispute, the proceedings have the incidents of a suit in equity. The inquiry is not restricted to the legality of the detention and extends far beyond the issues ordinarily involved in a conventional habeas corpus proceeding. In a child custody dispute the inquiry concentrates on what will best serve the interests of the child.[17] In resolving such disputes the chancellor considers all the rights, claims, evidence, relationships and, it has been said, even the imponderables.[18] The chancellor considers, but is not necessarily bound by prior orders of other courts. *In re Gould* (1913), 174 Mich 663. 39 Am Jur, Parent and Child, § 25; 25 Am Jur, Habeas Corpus, § 82.

"Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children." *May* v. *Anderson* (1952), 345 US 528, 536 (73 S Ct 840, 844, 97 L ed 2d 1221, 1228), per Frankfurter, J., concurring.

A common theme which runs through the cases, those concerning both legitimate and illegitimate children, is that an established family relationship is ordinarily to be preferred and protected.

This lawsuit is a child custody dispute. The adoption statute does not purport to establish standards for resolving such disputes concerning legitimate or illegitimate children or to vest in the probate court the power to do so.

In recognition of the fact that normally both parents of legitimate children exercise custody and

---

[17] *Fritts* v. *Krugh*, 354 Mich 97, 117; *Ex parte Parker*, 195 Okla 224, 228 (156 P2d 584, 588); and cases cited in footnotes 10, 12, 15, and 16; 25 Am Jur, Habeas Corpus, §§ 78, 80; 10 Am Jur 2d, Bastards, § 64.

[18] *Guardianship of Smith, supra,* opinion of Traynor, J.

that it is unusual for a putative father to do so,
the adoption statute requires consent to adoption
by both parents of a legitimate child and only
that of the mother where the child is not legitimate.
The legislative classification has a substantial basis
in experience, is reasonable, and is essential to a
workable adoption program.[19]

The appellants assume that, since the mother's
consent alone is required to authorize adoption of
an illegitimate child, by her act alone a dispute
concerning the custody of her child is finally re-
solved. We cannot agree.

## III.

Our Supreme Court has held that circuit courts
possess the general and historic chancery power
over children and their custody, except to the extent
that original jurisdiction of juvenile delinquents
and dependents[20] has been vested in the juvenile
courts. *Sovereign* v. *Sovereign, supra* (from ma-
jority opinion).[21] In *Finlay* v. *Finlay* (1925), 240
NY 429, 433, 434 (148 NE 624, 626, 40 ALR 937),
the court considered equity's historic jurisdiction
to resolve child custody disputes without regard to
whether there is an express statutory grant of such
jurisdiction and, in language quoted approvingly

---

[19] Compare *Thomas* v. *Children's Aid Society of Ogden* (1961), 12
Utah 2d 235 (364 P2d 1029), where, in order to sustain a like pro-
vision against attack on constitutional grounds, the court thought it
necessary to declare that the father of an illegitimate child has no
rights, only duties. Contrast *Barnardo* v. *McHugh, supra,* where the
statutory imposition of duties on the mother was thought to prevent
a decision that she was destitute of any rights in relation to the
child's custody.

[20] As to juvenile delinquents and dependents, see footnote 5.

[21] Compare *Romatz* v. *Romatz* (1959), 355 Mich 81, where the
Supreme Court considered the circuit court's jurisdiction in equity
and concluded that the circuit court has the inherent power to annul
a marriage for fraud in a case not provided for in the statute con-
cerning annulment,

in the concurring opinion in *Sovereign* v. *Sovereign, supra,* declared:

"The chancellor in exercising his jurisdiction upon petition does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against anyone. He acts as *parens patriae* to do what is best for the interest of the child. He is to put himself in the position of a 'wise, affectionate, and careful parent' * * * and make provision for the child accordingly."

We have no hesitancy in holding that equity enjoys the same jurisdiction to decide custody disputes concerning illegitimate children as it so indisputably exercises in custody disputes concerning legitimate children. 10 Am Jur 2d, Bastards, § 64, and other authorities referred to in footnote 17. The absolute power of the Roman father, the once awesome power of the English father, and the power over illegitimate children once held by the parish is now exercised by the courts of chancery as *parens patriae.*

We also conclude that chancery's power concerning the welfare of legitimate and illegitimate children does not disappear upon the release of the child for adoption, or the consent of a placement agency to a petition for adoption, or even upon the entry by the probate court of a termination order.[22] We so hold on the authority of *In re Gould, supra* (discussed *infra*) and because, fundamentally, any other holding would create a vacuum of judicial power.

The probate court does not possess the power to require the placement agency or the Michigan children's institute (see footnote 3) to consent to a peti-

[22] Compare *Matter of Virginia Norman, supra,* where the father was awarded custody of an illegitimate child in peference to the mother, the mother relying on a statute providing that "it shall be sufficient for all purposes to refer to the mother as the parent having the sole custody of the child."

tion for adoption. It does not have the power to enter an order affecting the custody of an illegitimate child, neither delinquent nor dependent, other than an order approving a petition for adoption which has received the required consent. If Michigan's adoption statute, as appellant contends, confers on an agency the absolute and judicially unreviewable power to decide who shall enjoy custody of the child and whether, by whom, and when the child may be adopted, subject only to confirmation by the court, there would arise serious constitutional questions under both the due process and equal protection of the law clauses and judicial articles of the State and national Constitutions. To avoid such constitutional problems we hold that chapter 10 of the probate code of 1939 does not deprive the circuit court of its historic and comprehensive power to decide custody disputes concerning children, legitimate and illegitimate.[23]

"The proceeding before us is one for the custody of a child and not for the adoption of it, nor for the termination of parental rights." *In re Welfare of Brennan* (1965), 270 Minn 455, 460 (134 NW2d 126, 130).

In *Brennan*, as here, the mother surrendered her illegitimate child to a welfare agency pursuant to an adoption statute. The court held that a plenary suit by the putative father attacking the contemplated adoption and seeking custody for himself was proper, even though the father's consent to the adoption was not statutorily required, because, among other reasons, the adoption procedure followed by the mother was unlikely to provide a forum for adjudication of the father's claim.

---

[23] Parenthetically, we note that the problem that faced the circuit judge could arise as to a legitimate child released for adoption by his parents or surviving parent, if the child had in fact established a familial relationship with one *in loco parentis*—say a grandparent, older sibling, aunt or uncle, et cetera. See *In re Gould, supra.*

In *Sovereign* v. *Sovereign, supra,* the majority opinion reasoned that the circuit court must be able to decide child custody disputes between parents where divorce has been denied because no other court was statutorily authorized to do so. Likewise here. The probate court does not have the power to decide the disputes between Mr. S and Miss M, between Mr. S and the child placement agency, or between Mr. S and the proposed adoptive parents. The circuit court is the only tribunal which has the plenary power to decide such disputes on their merits and which is not restricted in its inquiry.

Mark lived with his parents in a normal family relationship from his birth until he was a year and a half old. Had his parents been married and separated his mother ordinarily would have been awarded custody. If she did not desire custody or the court determined her unfit, custody ordinarily would have been awarded to his father.[24] In any such event, Mark would not have been deprived of the love of both parents at the same time. Mark did not know whether his parents were married, but his need for parental love and the security of a continuing relationship was at least as great as that of a legitimate child.

The history of the treatment of illegitimate children at common law was one of singular inhumanity.[25] The attitudes responsible for a rule of law which protected the English upper class from those whom they exploited, sexually as well as economi-

---

[24] CL 1948, § 722.541 (Stat Ann 1957 Rev § 25.311).

"The statute in question has never been construed as qualifying or restricting the inherent, broad, discretionary powers of a court of chancery to adjudicate as to the custody and control of children whose interests are before it, according to the varying elements for consideration arising in each case, and to make such disposition of each child as its best interests appear to demand." *Weiss* v. *Weiss* (1913), 174 Mich 431, 435.

[25] See 16 Colum L R 698 (1916), which compares the common law with legislative modifications in the States and other countries.

cally, are no longer voiced.[26] However, new rationales have now developed to continue outmoded rules of law.[27]

The appellants' presentation in this case proceeds on the assumption that placing Mark for adoption is inherently preferable to rearing by his father, that uprooting him from the family which he knew from birth until he was a year and a half old, secretly institutionalizing him and later transferring him to strangers is so incontrovertibly better that no court has the power even to consider the matter. Hardly anyone would even suggest such a proposition if we were talking about a child born in wedlock.

We are not aware of any sociological data justifying the assumption that an illegitimate child reared by his natural father is less likely to receive a proper upbringing than one reared by his natural father who was at one time married to his mother, or that the stigma of illegitimacy is so pervasive it requires adoption by strangers and permanent termination of a subsisting relationship with the child's father. There cannot be a "public policy" favoring adoption in all cases without regard to the particular facts, simply because, if there were such a policy, the law would not leave the consent decision to the unwed mother or permit the father to legitimate the child irrespective of whether he marries the mother.[28]

One in sixteen children is illegitimate.[29] While not customary, men and women still do live together as husband and wife without ceremonial marriage and have and raise children. The interests of these

---

[26] See Krause, Equal Protection for the Illegitimate, 65 Mich L R 477, 498 (1967).

[27] See Holmes, The Common Law, p 5.

[28] See discussion *infra* concerning legitimization.

[29] Equal Protection for the Illegitimate, *supra.*

children and of fathers and others *in loco parentis* in such situations may not be ignored as if these people simply do not exist. The legal system of a society which, in preference to making all illegitimate children wards of the State both in law and in fact, permits parents of illegitimate children to retain their custody unless and until the child is adjudicated neglected, dependent, or delinquent must expect to be confronted with custody disputes concerning such children and should have the capacity to decide such disputes on their merits.

The relationship of the child born out of wedlock with those who assume the parental role, putative father or otherwise, could well be the most important relationship in his life. It may be as meaningful a relationship as he ever achieves, and it should not be subject to termination at the judicially unreviewable fiat of the mother and a placement agency.

As the appellants interpret the law, should Miss M decide that her firstborn illegitimate child, now 9 years of age, should be placed for adoption, all Miss M needs to do is release it to a child placement agency and neither the child nor Miss M's parents who have, it would appear, reared that child, nor any court, could interfere. Today we are concerned with a child who was 1-1/2 years old at the commencement of these proceedings and is now 2-1/2 years of age. Tomorrow we may be concerned with a 5-, 8- or 10-year-old child who, unlike Mark, will be able to articulate the terror and heartache which we are told no court can prevent.

In just such a case, our Supreme Court in *In re Gould, supra,* held, where a child was raised by his maternal grandparents following his mother's death and the father, when the child was 8 years old, consented to the child's adoption by an aunt who

duly adopted the child in accordance with the applicable statute, that, on an application for a writ of habeas corpus by the aunt against the grandparents, the circuit court erred in holding that the adoption settled the matter and in failing to consider the best interests and welfare of the child, and, it appearing that the child had attained a satisfactory relationship with his grandparents who were fit and suitable, that, even though the aunt was also fit and suitable, the court should "let well enough alone" and the grandparents retain custody. The court rejected the concept that a child was property that could be disposed of or assigned by a father as in ancient Rome. The court observed that every child born in the United States, as part of his birthright of citizenship, was entitled to governmental protection and that "technical claims or naked legal rights" to children are to be subordinated in awarding custody to the paramount consideration, the best interests of the child.

We have considered the possible application of the paternity act, PA 1956, No 205, §§ 4, 7 (CLS 1961, §§ 722.714, 722.717), as amended by PA 1962, No 238 (Stat Ann 1965 Cum Supp §§ 25.494, 25.497), which provides a procedure whereby the father of an illegitimate child may consent to the entry of an order of filiation, and CL 1948, § 702.83, as amended by PA 1965, No 162 (Stat Ann 1965 Cum Supp § 27.3178[153]), which permits a putative father, by filing an acknowledgment in the manner prescribed, to legitimize his illegitimate child with identical status, rights, and duties of a child born in wedlock, effective from the child's birth. Mr. S's failure to have sought to invoke such statutory procedures before Miss M secretly signed the release to the adoption agency does not deprive the circuit court of the power to award custody to Mr. S.

In awarding custody the court attempts to determine what will best serve the interests of the child. While the neglects and failures of those who seek custody are to be considered in passing upon their fitness, particular neglects or failures often will not be determinative for a chancellor who must weigh all the factors in the record relevant to the best interests of the child.[30]

## IV.

Our Supreme Court has said that in deciding a dispute between a natural parent and a third party it is presumed that the child's best interests lie with his natural parents' exercise of custodial rights absent a showing of the natural parents' unfitness or their neglect or abandonment of the child, and the trial court may not indulge in a comparison of

[30] The Michigan statute is not crystal clear as to whether the father may legitimate the child against the mother's wishes. See *Guardianship of Smith* (1954), 42 Cal 2d 91 (265 P2d 888, 37 ALR2d 867), where a majority of the court, apparently without regard to prospective legitimization, except to indicate that legitimization will be more likely if the father has custody, awarded the father of an illegitimate child the same rights after the death of the mother as are enjoyed by the father of a legitimate child. Mr. Justice (now Chief Justice) Traynor wrote that he would require the father to offer a satisfactory explanation for his failure previously to legitimate and would require that he legitimate the children as a minimum prerequisite for establishing his fitness. The case is discussed in a note, Custody: A Dominant Right of the Father of an Illegitimate Child After the Death of the Mother?, 42 Cal L R 514. In *Caruso* v. *Superior Court in and for County of Pima* (1966), 100 Ariz 167 (412 P2d 463), after the mother released the child for adoption, the father filed a parental acknowledgment with the result that under Arizona statutory law the child could not be adopted without the father's consent, whereupon the agency sought to have the child declared dependent. The court held there was no evidence of dependency and that the father was entitled to the child since the mother had relinquished her rights. See *In re T* (1967), 95 NJ Super 228 (230 A2d 526), reviewing conflicting lines of authority as to whether marriage of the father to the mother after she surrenders the child for adoption but prior to actual adoption necessitates father's consent to adoption, and holding that it does not. In this case it had already been determined that the child's welfare, "always of paramount importance" (95 NJ Super at 239 [230 A2d at 531]) would not be served by restoring custody to the parents.

the parental home with the proposed alternative.[31] The various ramifications of that principle need not detain us here since we only hold that the pendency of the petition for adoption did not oblige the circuit judge to compare the proposed adoptive home with that of the natural father.

The usual procedure in the adoption of illegitimate children is not to disclose the identity of the proposed adoptive parents and the investigative report concerning them would not normally be made a matter of public record. It would not conform to traditional notions of procedural due process to permit comparison of the natural father's living plan, exposed to cross-examination by both the representatives of the placement agency and of the proposed adoptive parents, with the plan of the proposed adoptive parents, without disclosure of either the plan or the identity of the proposed adoptive parents and without opportunity for refutation by the father.

Although the proposed living arrangement described by Mr. S would not have the organization one would expect in a home where there is both a mother and a father, as it would be necessary to hire housekeepers and to rely on family members for daytime supervision, this is not much different than the arrangement which prevails in many households where the mother works, is deceased, incapacitated, or the parents are separated or divorced

31 *In re Ernst* (1964), 373 Mich 337, 371; *Herbstman* v. *Shiftan* (1961), 363 Mich 64, 67; *Fritts* v. *Krugh* (1958), 354 Mich 97, 115. Compare *In re Mathers* (1963), 371 Mich 516, 530. Other courts have refused to weigh the material advantages of the proposed alternative home in cases concerning custody of illegitimate children. *Matter of New York Association for Jewish Children, supra; Re Gary* (1960), 112 Ohio App 331 (14 Ohio Ops 2d 431, 83 Ohio L Abs 486, 167 NE2d 509, 511); *People, ex rel. Gill,* v. *Lapidus* (1953), 202 Misc 1116, 1119 (120 NYS2d 766, 769); *Ashton Adoption Case* (1953), 374 Pa 185, 200 (97 A2d 368, 376); *Matter of Anonymous* (1958), 10 Misc 2d 1076, 1080 (170 NYS2d 178, 184); *Lewis* v. *Crowell, supra.*

and custody has been awarded to the father. A home is not rendered unsuitable merely because there is not a permanent mother or, for that matter, father figure in residence throughout the day. Compare *In re Mrs. M, supra,* 74 NJ Super at 189 (181 A2d at 20); *People, ex rel. Anonymous,* v. *Anonymous* (1959), 19 Misc 2d 441, 445, 452 (195 NYS2d 1009, 1013, 1019).

Under the circumstances of this case, we think the trial judge correctly decided that the question before him in this case was whether Mr. S, having established a viable family relationship with Mark, and the mother having chosen to terminate hers, was a fit and suitable person to have his custody. The trial judge concluded that Mr. S was fit and suitable on the basis of substantial evidence and, in our judgment, his findings are not clearly erroneous.

It has been suggested that Mr. S delayed unduly in asserting his claim. The testimony amply supports the trial judge's determination that "he acted promptly to obtain custody of the child."

Although we are unwilling to acknowledge that child placement agencies enjoy the kind of judicially unreviewable power claimed for them in this case, we intend no criticism of the agency here appealing. All the appellants have acted in good faith in accordance with what they sincerely believe to be legally right and ethically sound.

Mr. S has gone through a difficult time. Although the adoptive parents have, we are told, been advised of the pendency of these proceedings, they now face unhappy days and, indeed, so too may Mark, now 2-1/2 years old, as he makes the necessary adjustment in leaving his present home for his former one. Child custody disputes are as vexing today as they were in Solomon's time.

We do not at all consider or reach the question whether in the exercise of its jurisdiction to decide child custody disputes the circuit court could on these facts prefer one formerly *in loco parentis* over adoptive parents whose rights have become vested by an order of adoption as distinguished from an order of termination. Compare *In re Gould, supra.* Nor do we hold that one *in loco parentis* is to be preferred over proposed adoptive parents (should they personally enter the contest) in every instance or that always in a case such as this the only issue is fitness of the one formerly *in loco parentis.* Rather we hold that, on the record before him, the trial judge, in the exercise of his discretionary equity powers, did not err in entering the order from which appellants have brought this appeal.

We remand to the trial judge without direction for the entry of such orders which, under the circumstances, in his discretion appear appropriate.

## V.

Appellants express concern that the trial court's ruling and its affirmance by this court will cast a cloud on all prior and future adoptions of illegitimate children. They suggest that any recognition of a right in the putative father could be the basis of a claim that the putative father is entitled to notice of proposed adoption proceedings even though the statute does not require his consent to adoption. However, in affirming the trial judge's ruling we do not recognize a right in the putative father, but rather assert the power of the circuit court to preserve an existing family relationship not only for the benefit of the father but primarily for the benefit of the child. Our holding does not oblige the probate court or a placement agency

to notify a putative father (even if they have information as to his identity) of the release of the child for adoption or of the pendency of a petition for his adoption or of the time of hearing on such petition. The statute imposes no such obligation.

"Courts are well aware of the just concern of welfare agencies in a sound adoption program and appreciate that such a program is essential to the best interests of a great majority of children born out of wedlock. Courts are aware that removal of children from adoptive homes following placement may be harmful and, if accomplished frequently enough, will deter qualified and deserving prospective parents from applying for an adoptive child. The courts are also aware that the uncertainty as to its status is not only harmful to the child but also frustrates and makes more difficult the work of the adoption agencies.

"But we think it should be said in light of judicial experience that the expressed fears of the welfare agencies are not entirely warranted. It has not been the policy of the courts to prefer the claims of the unwed father as opposed to the claims of welfare agencies where the granting of the father's claim would be harmful to the child's welfare. This policy is demonstrated by the last *Zink Case, In re Welfare of Zink,* 269 Minn 535 (132 NW2d 795), from which it clearly appears that courts will hesitate to upset an adoptive placement at the behest of the out-of-wedlock father.

"But, as recent decisions indicate, courts express a willingness to listen to a natural parent who asserts a sincere interest in and concern for his child. Certainly, in the case before us, where a mother seeks to relinquish the child and refuses marriage to legitimate it, a court cannot well look with indifference on the interest of the father who wishes to raise and provide for it. Even though the out-of-wedlock father does not appear before the court in the most favorable light, he should

nevertheless be given an opportunity to express his interest when the mother has relinquished the child. A sincere concern which springs from a sense of responsibility to his own flesh and blood is reason enough to permit him to be heard. Although this policy may present some risk for the adoption process, it should nevertheless be permitted where the claim is asserted promptly and under circumstances to minimize the risk of trauma to the child or to the adoptive parents which would accompany judicial acceptance of his assertion." *In re Welfare of Brennan,* 270 Minn 455, 462, 463 (134 NW2d 126, 131, 132).

The social legislation which recognizes the special competence and interest of child welfare agencies has as its ultimate goal the promotion of the welfare of the child and, in the case of the adoption statute, the achievement for the illegitimate or unwanted child of the kind of family relationship most legitimate children enjoy as a matter of course. The procedures established in the adoption statute are not ends in themselves. Where the child is both wanted and enjoys a family relationship the invocation of such procedures does not require the destruction of that relationship.

In this case a viable familial relationship had been established. In a large number of cases where illegitimate children are released for adoption, the release occurs shortly after the child is born and the child never enters the putative father's or, indeed, the mother's, home. The statute requires that upon filing a petition for adoption a thorough investigation shall be conducted. Any such statutorily required investigation should reveal whether there has been established the kind of relationship which prompted the circuit judge's findings in this case. If there is such a relationship, the question whether custody should be transferred to a father

desiring custody is a matter which the circuit court has the power to resolve.

It has been suggested that the mother may conceal the fact that there was such a familial relationship and, if the father were absent for an extended period of time, perhaps in military service, both the agency and the court could innocently approve an adoption. Fraud is always a possibility. A woman, for example, could release for adoption a child which, actually, is not her own. A married mother could release a child claiming that she was unwed. "Take therefore no thought for the morrow: for the morrow shall take thought for the things of itself. Sufficient unto the day is the evil thereof." Matthew 6:34.

Affirmed. No costs, a public question.

FITZGERALD, P. J., and T. G. KAVANAGH, J., concurred.