**LUTHERAN SOCIAL SERVICE, INC.,**
**Relator,**

v.

**James R. MEYERS, Judge et al.,**
**Respondents.**

**No. B–2282.**

Supreme Court of Texas.

Nov. 25, 1970.

Rehearing Denied Dec. 31, 1970.

McGee, J., dissented and filed opinion in which Hamilton and Pope, JJ., joined.

Greenhill, J., dissented and filed opinion in which Hamilton, Pope and McGee, JJ., joined.

Coffee, Ritter & Goldston, Donald N. Goldston, Austin, for relator.

Byrd, Davis, Eisenberg & Clark, Tom H. Davis and Bob Roberts, Austin, for respondents.

Crawford Martin, Atty. Gen., Jack Sparks, Asst. Atty. Gen., Austin, for intervenor.

SMITH, Justice.

This is an original proceeding in mandamus. The question for decision is whether a district court has the power to order a duly licensed child-placement agency to deliver citation to the persons with whom they have placed a child for adoption, under Rule 106, Texas Rules of Civil Procedure.

A brief statement of the unusual circumstances surrounding this case is necessary; out of regard for the individuals involved we shall not use their true names. In February, 1970, a minor girl gave birth in this state to a child out of wedlock; two days later the mother executed a consent form in which she expressed her belief that it was in the child's best interests that it be released to Lutheran Social Service, Inc., for the purpose of adoption. This was a regular consent, in accordance with the statute, Article 46a, Section 6(d), Vernon's Annotated Civil Statutes, and is not challenged in this proceeding. Shortly thereafter the Agency placed the child in the home of prospective adoptive parents, where the child (hereinafter referred to as "Jane Doe") still resides.

If events had run their usual course, Jane Doe would have resided in the home of her prospective adoptive parents for six months, and then the adoptive parents would have filed an adoption petition which would in all probability have been granted. Events, however, took a tragic turn. In April, 1970, Jane Doe's natural mother, along with the mother's parents, were all killed in a common disaster. Jane Doe's grandparents were apparently persons of means, and are said to have left an estate. Jane Doe, even though illegitimate and even if she is adopted by other parties is the presumptive heir of this estate.

In June, 1970, the lawsuit giving rise to this original proceeding was filed by John Doe and his wife. John Doe is Jane Doe's great-uncle; that is, he is the brother of the father of Jane Doe's natural mother. John Doe is the executor named in his brother's will and, in another proceeding, has filed a will construction petition; but this proceeding was for the adoption of Jane Doe. The petition for the adoption of Jane Doe was filed on June 29, 1970, in the 98th District Court of Travis County. In response to certain motions and requests in the petition, the District Judge signed an order, on June 29, 1970. The

order states that the Court is of the opinion that the Does' motion for a temporary restraining order and hearing thereon should be granted, and orders that the relator and "that person or persons having the possession, custody or control over Jane Doe be duly cited to appear" on a stated date, "to show cause why temporary restraining order and injunction should not issue temporarily restraining and enjoining Lutheran Social Services, Inc., and/or any other person from adopting, causing to be adopted or instituting or prosecuting any proceeding for adoption of the same Jane Doe until further hearing and order of this Court." The order also directed that "service of citation upon said person or persons having the possession, custody or control of Jane Doe is allowed and ordered by serving Lutheran Social Services, Inc., by serving Mr. Rolf Norman, its Executive Director, in Austin, Texas, with instructions and a further order by this Court that Mr. Norman forward immediately to said person or persons having the possession, custody or control of Jane Doe the copy of citation and petition served upon him under Rule 106, Texas Rules of Civil Procedure." The Sheriff's return shows that the citation was served on June 29, 1970, as directed.

On June 30, 1970, Relator filed a motion to dissolve the order discussed above, and a motion for continuance of the hearing on the temporary injunction and restraining order. The District Court held a hearing on Relator's motion on July 1, 1970, at which time the parties stipulated to certain facts not relevant at this point.

As a consequence of the hearing on July 1, 1970, the District Judge determined that Relator's motion for a continuance should be granted, but that his motion to dissolve the order of June 29 should be denied. The Judge drafted another order, reiterating the terms of the order of June 29, outlined above, but refrained from signing the later order so that Relator might test its validity in this Court. To accomplish that purpose Relator has filed in this Court a "Petition for Writ of Prohibition and/or Mandamus." The Prayer of that Petition requests that this Court:

"issue its Writ of Prohibition or its Writ of Mandamus directing the District Judge not to sign and enter any Order in Cause No. 181,580 in the District Court which will have the effect of requiring the Agency or any one employed by the Agency to forward any copy of the Citation issued out of such cause or the Petition therein filed by [Mr. and Mrs. John Doe] to the person or persons with whom the Agency has placed such child for adoption or which will have the effect of notifying any such person or persons of the pendency of such proceeding in the District Court, that this Honorable Court will also issue its Writ of Mandamus or its Writ of Prohibition directing the District Judge to dissolve his Order of June 29, 1970, requiring the Executive Director of the Agency to forward immediately to the person or persons having the possession, custody or control of such child the copy of Citation and Petition served upon him under Rule 106, T.R.C.P. * * *."

Relator's burden is a heavy one. If the District Judge's order is one within his discretionary powers, the relator must show that it is a "clear abuse of discretion." Crane v. Tunks, 160 Tex. 182, 328 S.W.2d 434 (1959); see also Iley v. Hughes, 158 Tex. 362, 311 S.W.2d 648 (1948). We hold that the relator has not satisfied that test. The agency argues, in essence, that after it acquired the consent from Jane Doe's mother, the agency stood in loco parentis, and the District Judge was powerless to interfere with the placement process by ordering notification to the prospective adoptive parents. The agency primarily relies upon Catholic Charities of the Diocese of Galveston, Inc., v. Harper, 161 Tex. 21, 337 S.W.2d 111 (1960), in which we held that:

"where the parents have surrendered their child to the custody of an agency

licensed by the State Department of Public Welfare to place children for adoption and have given their written consent that such agency may place the child for adoption, that consent is subject to revocation only by proof of fraud, misrepresentation, overreaching and the like." 337 S.W.2d at 114–115.

In the course of that opinion we stated, regarding the consent section of the adoption statute, Article 46a, sec. 6, Vernon's Annotated Civil Statutes:

"The effect of the statute obviously is that after the parental consent is given the child-placing agency stands in loco parentis to the child and is clothed with the authority to give or withhold the consent necessary to the entry of a judgment for adoption." 337 S.W.2d at 112–113.

It is the latter statement on which relator places its greatest reliance; that statement cannot however, be interpreted outside the facts of that case. In *Catholic Charities* the dispute was between a parent who had relinquished custody of her child and the agency which had gained custody. Our statement that the agency stood in loco parentis must be understood as an adjudication between the agency and the natural parent; nothing in that opinion limits the traditional role and duty of the court as guardian of the best interest of children who come under its control.

Neither does the Adoption Act, Article 46a, purport to limit that traditional function of the court. The statute in fact, repeatedly accords to courts supervisory and discretionary powers. Article 46a, Section 3, Vernon's Annotated Civil Statutes, for example, empowers the court to waive the usual requirement that the child to be adopted live in the home of the adoptive parents for six months prior to the legal adoption "when the Court is satisfied that the home of the petitioner and the child are suited to each other." Article 46a, Section 7, Vernon's Annotated Civil Statutes, empowers the court to remove the

child from the custody of its adoptive parents and award custody to the natural parents or other persons upon proof of abuse, neglect, or ill treatment of the child by the adoptive parents. Article 46a, Section 10(c) Vernon's Annotated Civil Statutes, makes the records of child-placing agencies confidential, but empowers the court to direct the Agency to open its records for "inspection and/or copy." These statutory provisions are indicative of the wide discretion the Legislature has granted the courts to act, when in the court's opinion the best interest of the child would be served thereby.

In Davis v. Collins, 147 Tex. 418, 216 S.W.2d 807 (1949), we affirmed the district court's dismissal of an adoption petition filed by persons who had not received the consent of the person who occupies the same position as the agency in this case. We held that the statutory scheme required that, in order for the petition to be granted they must have received the consent and, since they had not, they were ineligible to adopt the child. In response to the petitioners' argument that the effect of our holding was to deprive the court of power to act in the child's best interest, in the absence of consent by the child's custodian, we stated:

"[I]t has been held in other States (although the matter has not been decided in this State) that, if a guardian or custodian of a child refuses to give his consent to an adoption, and the court feels that an adoption would serve the best interest of the child, the court is justified in proceeding as if the consent had been given. See 2 C.J.S., Adoption of Children, § 24, page 393.

"The Legislature in the enactment of the statutes under consideration endeavored to protect the interests of neglected and abandoned children, and the statutes enacted would be weak and inefficient if the Legislature had not also thereby empowered the courts to exercise their authority and discretion in car-

rying out the legislative intent as expressed in the statutes. The rights and welfare of the children are the paramount things to be considered in adoption and child custody cases." 216 S.W. 2d at 811.

The scope of the court's discretionary power to serve the child's best interests was carefully reviewed in the well-reasoned opinion of In re Mark T., 8 Mich. App. 122, 154 N.W.2d 27 (1967). In that case the natural father of an illegitimate child who, although never marrying the child's mother, had established a viable family relationship with the child, was awarded custody even though the child's mother had consented that the child be adopted and the child had been placed in the home of adoptive parents. A probate judge had entered a termination order pursuant to the Michigan statute, in effect finding that the adoption petition of the adoptive parents had been filed, and investigated and consented to by the placement agency. The order effectively terminated the agency's rights over the child.

The court held, regarding the scope of a court's power to act in the child's best interests:

"[C]hancery's power concerning the welfare of legitimate and illegitimate children does not disappear upon the release of the child for adoption, or the consent of a placement agency to a petition for adoption, or even upon the entry by the probate court of a termination order. We so hold * * * because, fundamentally, any other holding would create a vacuum of judicial power.

"If Michigan's adoption statute * * * confers on an agency the absolute and judicially unreviewable power to decide who shall enjoy custody of the child and whether, by whom, and when the child may be adopted, subject only to confirmation by the court, there would arise serious constitutional questions under both the due process and equal protection of the law clauses and judicial articles of the State and national Constitutions. To avoid such constitutional problems we hold that chapter 10 of the probate code of 1939 does not deprive the circuit court of its historic and comprehensive power to decide custody disputes concerning children, legitimate and illegitimate." 154 N.W.2d at 38.

■ This case does not require the broad holding made by the Michigan court. It should be remembered that this is not an adjudication of the merits of the adoption petition filed by John Doe. The only question before this Court is whether the District Judge had the discretionary power to order the prospective adoptive parents to be served with citation under Rule 106. We hold that he did. We further hold that his order was not a clear abuse of that discretionary power, as it must be if the extraordinary remedy of mandamus will lie.

The relator emphasizes the disruptive effect the District Judge's order will have upon the lives of the child and the prospective adoptive parents, during the delicate period of adjustment which we recognized to be of great importance in the *Catholic Charities* case, supra. The relator argues that the Judge's order will necessarily inform the child and its prospective adoptive parents of the child's family background. All of this contravenes usual and accepted policies of child-placing agencies. We agree with the relator that none of this is desirable, but we must recognize that the usual adoption process will be disrupted in any event due to the peculiar and tragic circumstances surrounding this case. The District Judge had the facts before him when he issued the order complained of. The parties had stipulated, prior to the hearing of July 1, 1970, that John Doe was the independent executor of the estate left by Jane Doe's grandparents. The administration of that estate, of which Jane Doe is presumptively the only heir, will necessarily inform the prospective adoptive parents of Jane Doe's background.

Relator argues that not only will the Judge's order inform the prospective adoptive parents of Jane Doe's background, it will also inform Mr. and Mrs. John Doe of the child's whereabouts and the identity of the prospective adoptive parents. We do not agree. The citation which was delivered to Rolf Norman, Executive Director of the relator, for him to forward to the prospective adoptive parents, is addressed to "The Person or Persons having the possession, custody and control of Jane Doe." Nothing in the citation or the order complained of requires the relator to inform John Doe of the identity of those persons. The citation, which has only the usual effect of any other citation, does not require those persons to attend the hearing on the temporary injunction. The citation merely gives them the opportunity to attend and participate if they wish. If they decide to attend, they may do so either in person or by counsel. If they choose the latter, their identities and the child's whereabouts need not be revealed to John Doe. They may even choose not to attend the hearing in view of the fact that the relator has vigorously represented their interests to this point, and will presumably continue to do so.

For the reasons stated, Relator's Prayer for a writ of mandamus is denied.

Dissenting opinion by GREENHILL, J., in which HAMILTON, POPE and McGEE, JJ., join.

Dissenting opinion by McGEE, J., in which HAMILTON and POPE, JJ., join.

McGEE, Justice (dissenting).

I respectfully dissent.

The majority opinion first assumes, without discussion, that the trial court has jurisdiction and then goes on to state: "[t]he question for decision is whether a district court has the power to order a duly licensed child-placement agency to deliver citation to the persons with whom they have placed a child for adoption, under Rule 106, Texas Rules of Civil Procedure." In so stating the question the majority does not pass upon whether or not the great aunt and great uncle, who are strangers to any true adoption proceeding, have any standing to invoke the jurisdiction of *any* district court in any adoption proceeding to thus obtain this extraordinary ancillary relief. I would hold, under the facts of this particular case, that the trial judge had no jurisdiction and therefore was without power to grant any ancillary relief. I would further hold, assuming *arguendo* that the district court had jurisdiction, that the trial judge's order was an abuse of discretion.

Lutheran Social Service, Inc. is a Child Placing Agency as defined in Article 695c, Vernon's Annotated Civil Statutes, and duly licensed as such by the Texas Department of Public Welfare. Texas courts have held that, where the parents (in the case of an illegitimate child, the mother) have placed the child in the custody of such licensed agency, together with written consent that such agency may place the child for adoption, the consent cannot thereafter be revoked absent proof of fraud, misrepresentation or overreaching and the like. Catholic Charities of the Diocese of Galveston, Inc. v. Harper, 161 Tex. 21, 337 S.W.2d 111 (1960); Carrell v. Hope Cottage-Children's Bureau, Inc., 425 S.W.2d 898 (Tex.Civ.App.—Eastland 1968, writ ref'd n. r. e.); Hamer v. Hope Cottage Children's Bureau, Inc., 389 S.W.2d 123 (Tex.Civ.App.—Dallas 1965, no writ); Kamleh v. Brown, 389 S.W.2d 513 (Tex.Civ.App.—Waco 1965, no writ) I have found no Texas cases holding to the contrary. Respondents candidly admit in their brief: "that we know of no evidence upon which we could contend that the parental consent given by [the natural mother] has been voided by her death or that the consent was initially obtained by fraud, duress, or misrepresentation. Neither do we challenge the fact that the relator stands in loco parentis to this child."

The great aunt and great uncle have not and cannot file a petition for an adoption containing two of the essential elements required by Section 1a, Article 46a, Vernon's Annotated Civil Statutes which reads in part as follows:

"Section 1a: Every petition for leave to adopt a minor child *shall* set forth among the facts relative to petitioner and child the following information * * * (5) The date on or about which the minor child was placed in the home of petitioners; (6) what written consent papers have been obtained from the natural parent or parents and if none obtained, then specify which exception to the necessity for such consent is applicable * * *." (Emphasis added).

Section 3, as does Section 1a, Subsection (5), contemplates possession of the child in the home of the prospective adoptive parents.

The great aunt and great uncle's petition for adoption includes neither parental consent papers nor specifies an exception which would authorize their absence. Therefore, on form alone the district court jurisdiction was never properly invoked. The written consent of a parent when required is jurisdictional. Stinson v. Rasco, 316 S.W.2d 900 (Tex.Civ.App.—Dallas 1958, no writ); Wilde v. Buchanan, 303 S.W.2d 518 (Tex.Civ.App.—Austin 1957, writ ref'd n. r. e.), aff'd per curiam, 157 Tex. 606, 305 S.W.2d 778 (1957); Smith v. Curtis, 223 S.W.2d 712 (Tex.Civ.App.— Dallas 1958, no writ); Pearce v. Harris, 134 S.W.2d 859 (Tex.Civ.App.—El Paso 1939, no writ); 2 C.J.S. Adoption of Children § 35 (1936). Under the facts of this case, the only consent given by the natural mother was to the Child Placing Agency—one of the exceptions provided for under Article 46a, Secs. 6(d) and (e). I would hold that the consent of the Child Placing Agency here, Lutheran Social Service, Inc. is a jurisdictional requirement.

As this Court did in the *Catholic Charities* case, we should look to the intention of the Legislature in enacting the 1951 Amendment to § 6 Art. 46a, which created a new exception to the necessity for consent by the natural parents to a specific adoption. The Act now reads in part as follows:

*"Consent of parents and child; exceptions"*

"Sec. 6. Except as otherwise provided in this section, no adoption shall be permitted except with the written consent of the living parents of the child * * * (e) In the case of a child placed by its parents in a child-placing agency or institution licensed by the State Department of Public Welfare to place children for adoption, it shall be sufficient for the living parents to consent in writing that such agency or institution place such child for adoption, and no further consent shall be required of such living parent."

The emergency clause to that Act is pertinent in revealing the legislative purpose and intention. It reads in part as follows:

"The fact that many adoption petitions now being filed do not disclose sufficient information to enable the State Department of Public Welfare to efficiently perform the responsibilities placed on it by present law; the fact that the persent adoption laws do not expressly permit parents to place children for adoption with a licensed child-placing agency or institution and *confer on such institution the power to consent to the adoption without disclosing to the natural parents the names of the adoptive parents* * * *" (Emphasis mine.) Tex.Laws 1951, ch. 249, § 6 at 388.

Respondents rely on Art. 46a, Sec. 10(c), which provides:

"The files and records in adoption proceedings which are filed with and maintained by Child-Placing Agencies that

are licensed by the State Department of Public Welfare in accordance with the Public Welfare Act of 1941, as amended, shall not be open to inspection and/or copy by any person *except upon the order of the court directing the Child Placing Agency to permit the inspection and/or copy of the records.*" (Emphasis supplied by respondents).

The caption and emergency clauses of that Act are pertinent in revealing the legislative purpose and intention:

"Caption: An Act Amending Section 10 of Senate Bill No. 383, Chapter 177, Page 300, General Laws of the State of Texas, Acts of the 42nd Legislature, Regular Session, 1931, as amended, being codified as Section 10 of Article 46a, Vernon's Texas Civil Statutes; providing for the *confidentiality* of adoption records filed with the State Department of Public Welfare; providing for the *confidentiality* of adoption records filed with licensed Child-Placing Agencies; amending the Revised Civil Statutes of Texas, 1925, by adding a new Article relating to the *confidentiality* of certain pleadings, records and documents relating to a dependency hearing concerning a child born out of wedlock; providing a repealing clause; a savings clause; and declaring an emergency." (Emphasis mine).

"Sec. 5. The fact that the present Statutes make no provision for the protection of the *confidential* nature of the adoption records filed with the State Department of Public Welfare and licensed Child-Placing Agencies; the fact that the State Department of Public Welfare and licensed Child-Placing Agencies receive many requests for information from such records, and the *confidentiality* of such records in the Department and in the Agency are not protected although similar records filed in the courts are protected makes it imperative that such records in the office of the State Department of Public Welfare and licensed Child-Placing Agencies also be protected; and the crowded condition of the calendar create an emergency and an imperative public necessity that the Constitutional Rule requiring bills to be read on three several days in each House be suspended, and the same is hereby suspended; and this Act shall take effect and be in force from and after its passage, and it is so enacted." (Emphasis mine). Tex.Laws 1965, ch. 151, § 5, at 324.

Both the caption and the emergency clause indicate the true purpose of the Act to be the protection of the confidentiality of these records. I would limit the exercise of the court's discretion "to permit the inspection and/or copy of the records" to the judge of the court whose jurisdiction has been properly invoked by the filing of a petition that complies with the requirement of Section 1, accompanied by a proper consent as required by Section 6 of Art. 46a.

Adoption was unknown at common law, and is therefore exclusively a creature of the Texas Legislature. The Texas Adoption Act requires parental consent for adoption, but the Act further provides that no further consent shall be required of the natural parents if they have placed their child with a licensed Child Placing Agency. Under the *Catholic Charities* case, supra, after giving their consent, there is nothing further that the parents can do; their consent is final and irrevocable. Under Article 46a, when parental consent is given to a Child Placing Agency the ties between the natural parents and the child are terminated. There can be no legal basis, under the facts of this case to construe the Adoption Act to allow strangers (the great aunt and great uncle), after the death of the natural mother who has given her consent to a Child Placing Agency, to accomplish that which the courts of this State would not permit the natural mother to do while living.

The great aunt and great uncle are without any standing to pursue the adoption they have filed. The natural father would have no standing to seek adoption of a child born out of wedlock unless the child was legitimized by a marriage of its parents. We so held in Home of Holy Infancy v. Kaska, 397 S.W.2d 208 (Tex.Sup. 1965). That opinion noted that Texas adheres to the common law rule that a father has, by nature of the blood relationship alone, no rights in his illegitimate child (page 210): "There is an early decision holding that the father has a prior right to letters of guardianship where the mother is deceased, Barela v. Roberts, 34 Tex. 554 [1870], but it is one thing to permit the father to assume the responsibilities imposed by law upon a guardian and an entirely different matter to recognize rights of custody when there is no corresponding duty to support." We would not permit the father to seek the information being sought in this case by filing an adoption proceeding. The same reasoning is applicable to this action, designated adoption proceedings, filed by other strangers, the great aunt and great uncle. Stated otherwise, it would be as logical for a district court, not having jurisdiction of the "adoption proceeding" in the absence of a petition containing the statutory requirements accompanied by written consent of the parents, to grant the natural father of an illegitimate child ancillary relief to learn the whereabouts of his child and the names of the prospective parents to whom custody of the child was placed by a licensed Child Placing Agency as it would be to furnish this information to a great aunt and great uncle.

If we permit strangers to initiate adoption proceedings, it might well be that the natural father would be in a stronger position than either the great aunt and great uncle and the prospective adoptive parents. We should not let events occurring subsequent to the mother's action in giving consent and delivering custody of the child to the Child Placing Agency for adoption serve as a basis for revoking such consent. The acquisition of a large estate by the child is not a circumstance which should require us to abandon the requirements laid down by our Legislature. The Legislature has enacted into law the conditions upon which a minor child may be adopted and, until those conditions are met, the fitness and qualifications of the respective parties are incidental. I would hold that the issue of paramount importance, the welfare of the child, could only be raised in adoption proceedings filed in the court in which jurisdiction was properly invoked by a petition containing the essential information required by Section 1a, Art. 46a.

In Holloway v. Currie, 388 S.W.2d 435 (Tex.Civ.App.—Waco 1965, no writ), the action of the Court of Domestic Relations, denying an adoption (where neither the parents of the child sought to be adopted nor the Judge of the Juvenile Court had consented to the adoption) without granting a full hearing on the petition to adopt was affirmed. In the face of written consent by the mother given to an authorized Child Placing Agency, I would hold that the great aunt and great uncle have no standing to initiate adoption proceedings, particularly in this situation where legal custody of the child is in the prospective adoptive parents' home and no complaint is made of the propriety of the Child Placing Agency's actions, other than a refusal to disclose the whereabouts of the child and the names of the prospective adoptive parents.

Inasmuch as the great aunt and great uncle have no standing to adopt this child, unless the trial court having jurisdiction of the adoption proceedings concludes that the prospective adoptive parents are not fit persons to adopt the child, it would be cruel to all parties concerned and not in the best interest of the child to permit the present adoption proceeding to continue. Strangers to adoption proceedings, as contemplated by Art. 46a, should not be permitted

to disrupt the normal procedure required by this statute.

The majority opinion candidly admits that it is relying on *dictum* from the opinion in Davis v. Collins, 147 Tex. 418, 216 S.W. 2d 807 (1949). If that decision is pertinent at all in this case, it would support the relator's position and that of this dissenting opinion.

In the *Davis* case there was an abandoned child whose mother was mentally deficient and a ward of a State institution. In accordance with Article 2335, Vernon's Annotated Civil Statutes, the rights of the child's natural parents had been terminated by the juvenile court, and care, custody and control of the child were transferred to Sam Davis, Chief Probation Officer for Dallas County. The law placed the responsibility on Davis to give his consent to adopt the child. After the child was placed in the custody of Davis, he placed the child in the home of Collins and his wife, who were paid an allowance for caring for the child. The child remained in the Collins home for almost four years. On August 27, 1947, Sam Davis removed the child from the Collins home and placed it in another home. The Collinses filed an original petition for adoption on November 5, 1947. The people in whose home the child had subsequently been placed intervened. The district court, in which the petition was filed, appointed Sam Davis as a " 'suitable person' to investigate 'the former environment and antecedents of the child for the purpose of ascertaining whether he (she) is the proper subject for adoption,' " and the "home of the petitioner to determine whether it is a suitable home for the child."

Sam Davis reported that he found no fault with the Collinses' home or with petitioners themselves, but recommended that the petition be denied for three reasons: (1) The consent of Sam Davis, as custodian of the child under order of the juvenile court had never been received; (2) the child no longer resided in the home of petitioners; and (3) cognizance should be taken of the child's tender age (5 years) in relation to that of the adoptive parents (62 and 45 years of age). He concluded that the best interest of the child would be served by denying the petition.

The trial court denied the petition of the Collinses and dismissed that of the intervenors. The intervenors did not appeal. The court of civil appeals reversed the judgment of the trial court and rendered judgment that the petition of the Collinses be granted. This Court reversed the judgment of the court of civil appeals and affirmed that of the trial court.

The partial quotation from the *Davis* case appearing in the majority opinion is pure *dictum*. The petition for adoption by the Collinses was denied on the specific ground that they had not received consent to adopt from the statutory authority. Davis had given his consent to the adoption by intervenors. That *dictum* is directed to a situation where the guardian refuses to give consent. In our case consent was freely given—and the propriety of this action is not even questioned.

As noted above, the quotation from the *Davis* case in the majority opinion is a partial one and is taken out of context. Keep in mind that a dependent and neglected child was involved in the *Davis* case. That opinion is dealing with Article 2336, which reads in part as follows:

"The court may change the guardian of such child if, at any time, it is made to appear to the court such change is to the best interest of the child."

The portion of the Davis opinion immediately preceding the quotation in the majority opinion reads as follows:

"Respondents [Collinses] argue that if the custodian of a child withholds his consent to an adoption, the court is powerless to act, even though its action would be for the best interest of the child. The provisions of the statute under which the custody of a child is awarded refute this argument. It is therein provided that a change of guard-

ianship can be made at any time it appears necessary to secure the best interest of the child. See Article 2336."

The three reasons given by Davis in refusing to give consent to the Collinses would bar the granting of the petition for adoption being sought in this case by the great aunt and great uncle. Why should this Court unduly arouse the hopes of the great aunt and great uncle, when their efforts are doomed to fail and bound to cause heartaches, expense and confusion to themselves, the prospective adoptive parents and the child?

This petition for adoption is no more than a sham case filed for the purpose of obtaining information, the confidentiality of which is protected by statute. The same trial judge in his order of August 24, 1970, in the companion case (for construction of the will) recognized the statutory requirement protecting confidentiality of records in the Child Placing Agency and modified its order requiring the Child Placing Agency to serve a copy of the will construction petition on the child and the prospective parents under Tex.R.Civ.P. 106 to provide that the return of citation, after being displayed to and examined by the court in *camera,* would be sealed in an envelope and filed with the clerk of the court, such envelope to remain sealed and its contents to be revealed to no person except under order of the court *after due notice* to the plaintiff (the great uncle), the intervenors (Lutheran Social Service, Inc. and Rolf A Norman), and to anyone who might be appointed by the trial court to represent the minor child. That order protects the confidentiality of information protected by the Adoption Statute, Art. 46a, yet it assures that the interests of the child will be protected in the estate. The will contest case can then proceed to trial. The information (identity and whereabouts of the child) is relevant and material to the will construction case because she is a necessary party— and yet the identities of the parties to the adoption proceedings will remain protected. Having no standing in the adoption case,

the great aunt and great uncle cannot show why this information would be relevant or material, hence the granting of such ancillary relief requiring such disclosure was a clear abuse of discretion. Crane v. Tunks, 160 Tex. 182, 328 S.W.2d 434 (1959).

The majority also base their opinion on an out-of-state case, In re Mark T., 8 Mich. App. 122, 154 N.W.2d 27 (1967), which does not support their decision. Under the facts of that case, a habeas corpus proceeding by the natural father of an illegitimate child to obtain custody of the child, it would appear that under Texas law recognizing common law marriages (Michigan law does not) the child would not be an illegitimate child and therefore the consent of the natural father to place the child for adoption would be necessary. In that case only the consent of the mother had been obtained by the Child Placing Agency. In the instant case, it is undisputed that the child was born out of wedlock—and consent of the mother alone is required under Article 46a, Sec. 6(d). The custody sought was granted in In re Mark T. because the natural father had not consented to place his child with a child placing agency for adoption and because he had established a "viable family relationship", which would be regarded as a common law marriage under Texas law. (The great aunt and great uncle do not contend, nor are they able to allege that they have established a viable family relationship with this child).

I would hold that every trial judge does not have discretion in determining what action should be taken in an adoption proceeding for the best interest of the child; but rather, such discretion can only be exercised by the trial court in which jurisdiction has been invoked by a proper petition filed in accordance with Article 46a and in full compliance with the statutory requirements thereof.

Even if it is assumed that the district court had jurisdiction, the trial judge's order was an abuse of discretion on his part. The majority opinion cites Crane v. Tunks, supra, for the proposition that rela-

tor's burden in a proceeding for the extraordinary relief is a heavy one, that relator must show that the action of the trial judge was a "clear abuse of discretion." We said in that case (Page 440, of 328 S.W.2d 440):

"While it is the general rule that a mandamus will not issue to control the action of an inferior court * * * in a matter involving discretion, the writ may issue in a proper case to correct a clear abuse of discretion. Southern Bag & Burlap Co. v. Boyd, supra [120 Tex. 418, 38 S.W. 2d 565 (1931)], Womack v. Berry, 156 Tex. 44, 291 S.W.2d 677, 682 [1956]."

The mandamus *was* granted in the *Tunks* case. We held that the failure of the trial judge to examine the 1950 income tax return to determine what parts of it were relevant and material before requiring defendant to produce the return for examination and copying by plaintiff was an abuse of discretion. In that case, as in ours, the trial court stayed execution of his order until relators could apply to the Supreme Court of Texas for relief. Surely this Court does not regard the confidentiality of income tax returns as more important than the confidentiality of documents and information in adoption proceedings. The author of the majority opinion in this case is basing his decision on his dissent in Crane v. Tunks.

I submit that Iley v. Hughes, 158 Tex. 362, 311 S.W.2d 648 (1948), relied upon by the majority, is not in point. That opinion states (311 S.W.2d page 649):

"The question at issue in this original proceeding in this Court is this: Does Rule 174(b), Texas Rules of Civil Procedure, authorize a separate trial of the damage issues and the liability issues in a suit for damages for personal injuries? We hold it does not."

The jury answered the liability issues in favor of plaintiff but was unable to agree on the damage issues. The trial court overruled defendant's motion for mistrial and granted plaintiff's motion for interlocutory judgment on the liability issues and a separate trial on the damage issue. Defendant sought a mandamus directing the district judge to set aside his order for a separate trial of the damage issue and to declare a mistrial. Despite the conclusion of the majority that the trial judge was not authorized to order separate trials of liability and damages, the Court gave two reasons for its holding (pages 651–652):

(1) "This Court will not issue writs of mandamus to control or revise the exercise of discretion by trial courts in the performance of purely judicial as distinguished from ministerial acts."

(2) "* * * There is yet another reason why the writ of mandamus will not issue. Relator has an adequate remedy by appeal, and writs of mandamus will not issue to forestall or to correct errors of a trial court committed in the course of a trial when the parties have an adequate remedy by appeal."

The relator in the case before us does not have an adequate remedy by way of appeal. The remedy by appeal after conclusion of the trial will not adequately protect the interest of the parties who will be injured by the erroneous ruling of the trial court.

It is confusing to note that the author of the majority opinion in this case wrote the dissenting opinion in Iley v. Hughes. Under the facts and circumstances of this case, the trial court abused his discretion by ordering disclosure of confidential material protected by statute to strangers who will disrupt lawful adoption proceedings previously undertaken by a Child Placing Agency having the consent of the natural mother. Though this trial judge would protect the rights of the adoptive child in the will construction case by requiring the return of citation to be sealed and to remain sealed until a guardian *ad litem* had been appointed and a hearing held, this same judge has in effect ordered the release of the confidential materials without giving the prospective adoptive parents or the child or her guardian a right to be heard.

Article 46a, § 10 requires that all files and records of adoptions must be kept confidential. By this the Child Placing Agency is required to withhold information concerning the adoption of this child. This information would include the identity and whereabouts of the prospective parents and include reciprocal information about the child's lineage. The trial court's order would require the Child Placing Agency to violate the law—a clear abuse of discretion. If the Child Placing Agency is forced to comply with that order and deliver the petition as ordered, the adoptive parents will know everything included in the petition. If they appear to contest the case, their identity will be revealed. Although the great aunt and great uncle have no rights or standing, they would have received this confidential information. If they do not appear or appear by counsel only it is unclear what will happen to them, since the order requires that the " * * * person or persons having the possession, custody or control over Jane Doe be duly cited to appear * * *." They run a risk, at any rate, that the trial judge will compare them unfavorably with the great aunt and great uncle, who will undoubtedly be present.

The Court has resolved similar problems by issuing the extraordinary writs of mandamus or prohibition to correct a ruling of the trial court (1) when the order complained of is interlocutory and no direct appeal therefrom is available, and (2) when the remedy by appeal after conclusion of the trial will not adequately protect the interest of the party who would be injured by the erroneous rulings of the trial court. In Maresca v. Marks, 362 S.W. 2d 299 (Tex.Sup.1962), we said (page 301):

"A litigant so subjected to an invasion of his privacy has a clear legal right to an extraordinary remedy since there can be no relief on appeal; privacy once broken by the inspection and copying of income tax returns by an adversary cannot be retrieved."

This is, however, not a case wherein this Court is required to decide whether or not the trial court abused his discretion. This trial judge had no jurisdiction of the adoption suit, hence his purported order is void. By the devious procedure of purported adoption proceedings, which they had no standing to institute, the great aunt and great uncle seek information, indirectly, regarding the identity and whereabouts of the child and the prospective adoptive parents with whom the custody of the child was placed by the Child Placing Agency. The respondent trial judge acted in a matter over which he had no power. In Crouch v. Craik, 369 S.W.2d 311 (Tex. Sup.1963), in an opinion written by the author of the majority opinion in this case, we said (page 314):

"The writ of mandamus and writ of prohibition will issue for the reasons now to be stated. The respondent, Craik [district judge], was *without power* to enter the order granting the injunction. Therefore, the order was void, and in such a situation, this court (sic) does not hesitate to exercise its jurisdiction and grant the writs prayed for." (Emphasis mine).

I would grant the writ of mandamus.

HAMILTON and POPE, JJ., concur.

GREENHILL, Justice (dissenting).

I concur in the dissenting opinion of Mr. Justice McGee in so far as it would hold that there has been an abuse of discretion by the trial judge. I can conceive of facts where, in the management of a trust or related matters, it might become necessary for the confidential information involved to be revealed. Even in that event, the confidential information should be as closely kept as possible.

The facts here, however, do not in my opinion warrant the disclosure of the information. A rich child is entitled to the right of privacy prescribed by the Legislature the same as a poor one. The

child's mother obviously did not want her child placed within her family, and I cannot conceive of the legal success of the proposed adoption by the great aunt and uncle. Catholic Charities of the Diocese of Galveston, Inc., v. Harper, 161 Tex. 21, 337 S.W.2d 111 (1960). While in some future litigation or proceeding the identity of the child and the disclosure of the fact of her illegitimacy might be required, I see no reason under the circumstances before the Court to jeopardize the right of the child to the chance to a normal life in a normal home.

In acknowledging jurisdiction of the district court and in determining its "abuse of discretion," there is always a process of weighing; and in the overwhelming number of cases, the decision of a judge in exercising his discretion is respected and upheld. Here, however, the potential harm to the child (and her adopting parents) so far outweighs the good of disclosing confidential information in what seems to me a fruitless proceeding that it appears to me to be an abuse of discretion.

HAMILTON, POPE and McGEE, JJ., join.